GEISINGER HEALTH PLAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20793–90X.          Filed May 3, 1993.

*Frederick J. Gerhart* and *Melissa B. Rasman,* for petitioner.

*Vivian A. Moore,* for respondent.

OPINION

COHEN, *Judge:* This case is now before the Court pursuant to remand from the Court of Appeals for the Third Circuit in its opinion reversing our holding that petitioner's health maintenance organization (HMO) is an organization described in section 501(c)(3). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the time the petition was filed, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The Court of Appeals held that petitioner Geisinger Health Plan (GHP), standing alone, is not entitled to tax-exempt status because:

it does no more than arrange for its subscribers, many of whom are medically underserved, to receive health care services from health care providers. This is so even though it has a program designed to subsidize the subscribership of those who might not be able to afford the fees required of all other subscribers. Arranging for the provision of medical services only to those who "belong" is not necessarily charitable, particularly where, as here, the HMO has arranged to subsidize only a small number of such persons. * * *

*Geisinger Health Plan v. Commissioner,* 985 F.2d 1210, 1220 (3d Cir. 1993), revg. T.C. Memo. 1991-649. With respect to an argument not addressed in our Memorandum Opinion, the Court of Appeals stated:

Alternatively, GHP argues that it is entitled to tax-exempt status under section 501(c)(3) because it is an integral part of the Geisinger System. The integral part doctrine provides a means by which organizations may qualify for exemption vicariously through related organizations, as long as they are engaged in activities which would be exempt if the related organizations engaged in them, and as long as those activities are furthering the exempt purposes of the related organizations. *Texas Learning Technology Group v. Commissioner,* 958 F.2d 122, 126 (5th Cir. 1992). The integral part doctrine has been applied in the context of several Code sections. *See, e.g., Squire v. Students Book Corp.,* 191 F.2d 1018 (9th Cir. 1951); *Brundage v. Commissioner,* 54 T.C. 1468 (1970), *acq.* 1970-2 C.B. xix; Rev. Rul. 81-19, 1981-1 C.B. 353; Rev. Rul. 75-282, 1975-2 C.B. 201.

We decline to address the merits of the integral part doctrine at this stage, and instead remand the question of its application to this case to the Tax Court for clarification. *Cf. Garden State Bar Association v. Middlesex County Ethics Committee,* 687 F.2d 801, 802-03 (3d Cir. 1982). It is possible that the Tax Court, in ruling that GHP was entitled to exemption under section 501(c)(3), silently intermingled the roles played by GHP and other entities in the Geisinger System, thus effectively grounding its decision in the integral part doctrine. Its recitation of a great many facts regarding other entities in the Geisinger System suggests that it may have done just that. If that is the case, the Tax Court is in the best position to clarify this matter on remand. [*Id.* at 1220.]

In view of the comments and direction of the Court of Appeals, we here summarize and repeat those facts from our Memorandum Opinion most directly related to the alternative issue to be decided.

## Role of Petitioner in the Geisinger System

Petitioner owned and operated a health maintenance organization (HMO) under the Pennsylvania Health Maintenance Organization Act, Pa. Stat. Ann. tit. 40, secs. 1551-1567 (Supp. 1991). Petitioner was one of nine related organizations. The eight other organizations, referred to collectively as the Geisinger system and described below, were the Geisinger Foundation (the foundation), Geisinger Medical Center (GMC), Geisinger Clinic (the clinic), Geisinger Wyoming Valley Medical Center (GWV), Marworth, Geisinger System Services (GSS), and two professional liability trusts. Each of these eight entities was recognized by the Internal

Revenue Service as an exempt organization described in sections 170(b)(1)(A)(iii), 501(c)(3), and 509(a)(1).

The Geisinger system was a large health care network, the fundamental purpose of which was to provide health care services to residents of northeastern and northcentral Pennsylvania. The Geisinger system's service area covered 27 counties with a total population of 2.1 million.

The foundation controlled petitioner and the other entities in the Geisinger system, as well as three for-profit corporations. The foundation had the power, under the articles of incorporation and bylaws of petitioner, GMC, GWV, GSS, the clinic, and Marworth, to appoint the corporate members of those entities, who in turn elected their respective boards of directors. The foundation's board of directors was composed of civic and business leaders who were representative of the general public in northeastern and northcentral Pennsylvania and were public-spirited citizens. The foundation raised funds for the Geisinger system's numerous charitable purposes and activities.

GMC was one of the largest rural health care facilities in the United States. It operated a 569-bed regional medical center and, as of March 31, 1988, had 3,512 employees, including 195 resident physicians and fellows in approved postgraduate training programs. GMC accepted patients without regard to their ability to pay, including Medicare, Medicaid, and charity patients. It also operated a full-time emergency room that was open to all patients, regardless of their ability to pay. In addition, GMC was a teaching hospital that had made an extensive commitment to medical education.

GWV was a 230-bed hospital located in Wilkes-Barre, Pennsylvania. GWV accepted patients without regard to their ability to pay. It also operated a full-time emergency room that was open to all persons requiring emergency treatment, regardless of their ability to pay.

The clinic was established in 1962 to engage in medical research in conjunction with GMC and employed licensed physicians who performed medical services for GMC, GWV, and other entities within the Geisinger system. As of March 31, 1988, it employed 401 physicians who worked at the clinic and at 42 other locations throughout the 27-county area serviced by the Geisinger system. The clinic accepted patients without regard to their ability to pay.

Marworth operated two alcohol detoxification and rehabilitation centers and ran educational programs to prevent alcohol and substance abuse. GSS employed management and other personnel who provided services to entities in the Geisinger system.

Article 3 of petitioner's articles of incorporation included the following paragraphs identifying among its purposes:

A. Establishing, constructing, maintaining, operating and managing an organized system which combines the delivery and financing of health care and which provides, either directly or through arrangements with others, health services to voluntarily enrolled subscribers for a fixed prepaid fee;

B. Studying and investigating the delivery and financing of such services in order to assure their quality and cost effectiveness;

C. Engaging in education, study, research and scientific development in the field of prepaid health care delivery and financing systems and related fields;

D. Establishing, conducting, maintaining, managing and operating educational programs, courses and studies in the foregoing fields;

E. Constructing, operating and maintaining dispensaries, buildings and facilities relating to these purposes;

F. Publishing books and writing and disseminating articles or reports relating to these purposes;

G. Making donations and other transfers to Geisinger Foundation and to organizations controlled by such foundation and described in Section 501(c)(3) of the Internal Revenue Code, consistent with and in furtherance of these purposes; and

H. Engaging in all activities properly related to the foregoing, including, the requesting of funds from individuals, corporations and other exempt organizations for financing the services to be provided.

Pursuant to petitioner's bylaws, the foundation appointed its own executive committee of its board of directors to serve as petitioner's corporate members. Petitioner's bylaws also provided that its directors be elected by its corporate members from a representative group of its subscribers. Although those directors could be affiliated with group subscribers, they were to be elected because they were public-spirited citizens, not because of their affiliation with group subscribers.

In addition to the directors appointed by its corporate members, petitioner's board of directors was also composed of ex officio directors; namely, petitioner's president and the president, executive vice president, and all senior vice presidents of the foundation.

Petitioner was organized for the purpose of promoting health among the residents within its service area. Petitioner

promoted the full utilization of the health care services and facilities that the Geisinger system offered to those in its service area. Through petitioner, the Geisinger system was able to reach more people in its service area and to enhance its role as a regional health care provider. For the fiscal year ended June 30, 1987, petitioner generated 8.8 percent of the aggregate gross receipts of all the health care providers in the Geisinger system, and estimates as of that date projected that that percentage would increase to 14.35 percent by the fiscal year ending June 30, 1991.

The Geisinger system organized petitioner as a separate entity, rather than placing an HMO in either of the Geisinger system's hospitals (GMC or GWV) or in the clinic, for several reasons. First, an HMO in Pennsylvania was subject to heavy regulation by the State Department of Health and the State Department of Insurance. An HMO operated as a separate entity focused the regulation and the compliance efforts on the precise activity being regulated. Second, at least one-third of petitioner's directors had to be subscribers of the HMO. See Pa. Stat. Ann. tit. 40, sec. 1557 (Supp. 1991). The Geisinger system attempted to avoid disrupting its ability to govern the entities within that system by operating an HMO as a separate entity. Third, the Geisinger system believed it was preferable to operate an HMO as a separate entity from a systemwide organizational and management viewpoint.

Petitioner provided for the health care of its subscribers at 43 outpatient facilities through the clinic and at other locations through GMC, GWV, and Marworth, pursuant to contracts with those entities. The two principal categories of health services that petitioner offered were physician services and hospital services.

All physician services were provided to petitioner's subscribers pursuant to a medical services agreement between petitioner and the clinic. Petitioner compensated the clinic for the physician services provided to its members. The amount of the compensation was a fixed amount per member. That rate was a monthly rate and was set forth in a schedule to the agreement.

Petitioner's subscribers were to select a primary care physician from a list provided to them and maintained by the clinic. The clinic also arranged to have its physicians available to render emergency health care 24 hours a day, 7 days

a week, at the emergency departments of hospitals that contracted with petitioner or at the emergency departments of hospitals where petitioner's subscribers were typically directed for such services.

To fulfill its obligations, the clinic also contracted with other physicians throughout petitioner's service area. For the fiscal year ended June 30, 1987, more than 84 percent of the physician services were provided by physicians who were employees of the clinic, and the remaining services were provided by physicians who had entered into such contracts with the clinic. The clinic compensated all of the physicians who provided services to petitioner's subscribers, including those who provided services pursuant to contracts with the clinic.

Petitioner provided hospital services (inpatient, outpatient, and emergency) to its subscribers through contracts with hospitals in its service area. Two of the hospitals with which petitioner contracted were GMC and GWV. Petitioner paid those entities for hospital services provided to petitioner's subscribers on the basis of a negotiated per diem charge for inpatient services and on the basis of a discounted percentage of billed charges for outpatient services.

Petitioner also entered into hospital service agreements with 20 other hospitals. These agreements required that payments for hospital services provided to petitioner's subscribers were to be made on the basis of a negotiated per diem charge or a discounted percentage of billed charges or, in some cases, a combination of both. For the fiscal year ended June 30, 1987, 80 percent of all hospital services rendered to petitioner's subscribers were provided by GMC and GWV.

Petitioner also entered into agreements to provide other services to its subscribers, including agreements to provide pharmaceuticals, durable medical equipment, ambulance service, and physical therapy. Finally, petitioner contracted with GSS to provide to petitioner office space, supplies, and administrative services, including payroll, personnel administration, accounting, and data processing services.

Petitioner's membership was open to residents of 17 of the 27 counties that the Geisinger system serviced. Petitioner offered to residents of those rural counties services that might not otherwise be available to them. Findings of the U.S. Department of Health and Human Services indicated that, as of November 30, 1987, 23 percent of petitioner's

members resided in medically underserved areas and 65 percent of its members resided in counties containing medically underserved areas.

## *Discussion*

Respondent's final adverse ruling determined, in part, that "you do not qualify for exemption as an integral part of your parent because you do not provide essential services to your parent." In arguing that petitioner itself was not an exempt organization, respondent stated:

petitioner's primary activity is *arranging* for health care services. Petitioner actually only acts as "middle man" in the relationship between the providers of medical services (the hospitals, pharmacies, durable medical equipment vendors, ambulance services, and, through clinic, physicians, with which petitioner contracts) and the individuals who are the consumers of those services (petitioner's subscribers).

## Respondent explained her position as follows:

Respondent denied petitioner's application for exemption under the integral part theory on the grounds that petitioner is not conducting activities that are an integral part of the activities of its related exempt organizations in furtherance of their exempt purposes, and petitioner's activities would constitute an unrelated business if conducted by petitioner's affiliates. [Fn. ref. omitted.]

In order to qualify for exemption under the integral part theory, petitioner must perform an essential service either to its affiliates or to the class of direct beneficiaries of the charitable activities of its affiliates (in petitioner's case, its patients), as required by the entities in the legal precedents in this area. See *Squire v. Students Book Corporation,* 191 F.2d 1018 (9th Cir. 1951); Treas. Reg. sec. 1.502-1(b); Rev. Rul. 81-19, 1981-1 C.B. 353; Rev. Rul. 78-41, 1978-1 C.B. 148; Rev. Rul. 75-282, 1975-2 C.B. 201; Rev. Rul. 68-26, 1968-1 C.B. 272; Rev. Rul. 67-217, 1967-2 C.B. 181; Rev. Rul. 58-194, 1958-1 C.B. 240.

An organization can qualify under the integral part theory if it performs an essential service directly to its parent or related exempt entities. Treas. Reg. sec. 1.502-1(b); Rev. Rul. 78-41. If the services are provided to unrelated organizations, however, the provider does not qualify for exemption on this ground. Treas. Reg. sec. 1.502-1(b); Rev. Rul. 69-528, 1969-2 C.B. 127. Alternatively, an organization can qualify under the integral part theory if it performs a service on behalf of its parent directly to the class of beneficiaries of the charitable activities of its parent. For instance, in the case of universities, an organization can qualify if it performs a service to the faculty or students of the university. *Squire v. Students Book Corporation,* 191 F.2d 1018 (9th Cir. 1951); Rev. Rul. 81-19; Rev. Rul. 58-194. In the hospital context, the class of beneficiaries is the patients of the related exempt health care providers.

Petitioner argues that it is the "natural extension" of the Geisinger system, enabling the system to reach more people in its service area and to control the quality of health care delivered to the community. Petitioner argues that it could be operated directly by GMC, GWV, or the clinic without constituting an unrelated trade or business but that its separate existence was chosen for regulatory reasons and to provide services in a wider area than GMC or GWV. Petitioner also points out other benefits to the system from petitioner's operations, but, as respondent argues, such other support services do not distinguish petitioner from unrelated or nonexempt entities. Respondent also emphasizes petitioner's provision of similar services to unrelated entities.

The "integral part doctrine" is not codified but has been recognized in cases, regulations, and revenue rulings as a basis for exemption under section 501(c)(3). Section 1.502-1(b), Income Tax Regs., recognizes that doctrine as follows:

(b) If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the organization is owned by several unrelated exempt organizations, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations. For purposes of this paragraph, organizations are related only if they consist of—

(1) A parent organization and one or more of its subsidiary organizations; or

(2) Subsidiary organizations having a common parent organization. An exempt organization is not related to another exempt organization merely because they both engage in the same type of exempt activities.

The parties agree that an organization is entitled to exemption as an integral part of a tax-exempt affiliate if its activities are carried out under the supervision or control of an exempt organization and could be carried out by the exempt organization without constituting an unrelated trade or business.

Respondent contends that the above-quoted regulation does not create an independent route to exemption but merely recognizes that section 502, affecting corporations operated for the primary purpose of carrying on a trade or business for profit but paying all of their profits to a tax-exempt organization, will not defeat the exemption of an organization that otherwise qualifies for exemption. Respondent contends that the services provided to the exempt organization must be "essential" and must be provided only to the related exempt organization.

The case cited by the Court of Appeals and the parties as exemplifying the integral part doctrine is *Squire v. Students Book Corp.,* 191 F.2d 1018 (9th Cir. 1951). In that case, the court held that a business corporation that operated a store on the campus of Washington State College for the sale to students and faculty members at reasonable prices of textbooks, student supplies, and other items was exempt, even though approximately 4 percent of its business was done with persons not connected with the college. The court stated that "The business enterprise in which taxpayer is engaged obviously bears a close and intimate relationship to the functioning of the College itself." *Id.* at 1020. The opinion of the Court of Appeals, however, does not state a rule of law. After noting that various cases reached opposite conclusions and that a statutory change had been enacted, the court concluded that it was "not disposed to hold that the trial court was wrong in its disposition of the case." *Id.*

In *Brundage v. Commissioner,* 54 T.C. 1468, 1475 (1970), the Court held that a museum was "in operation an integral part of and valuable adjunct to the San Francisco school system, so that the gift to the City for the use in the museum was a gift to" an educational organization and thus deductible under section 170. The conclusion followed characterization of the system as "an important part of the city school system"; "readily available to, and widely utilized by, the city school district and neighboring school systems"; visited one

or more times in the course of their formal education by all or most of the school children of San Francisco; and having loaned exhibits and staff to individual classes throughout the city school system. *Id.* at 1474. The Court discounted the importance of availability of the museum to the general public for its own informal self-education.

In *B.H.W. Anesthesia Found., Inc. v. Commissioner,* 72 T.C. 681 (1979), the Court found that an incorporated department of anesthesiology was an integral part of a hospital and of the Harvard University Medical School. Continued membership in the organization depended upon the member physicians' continued association with the hospital and Harvard, and the organization's members provided all of their services to the department of anesthesiology of the hospital. Similarly, in *University of Mass. Med. School Group Practice v. Commissioner,* 74 T.C. 1299 (1980), the Court held that respondent erred in failing to rule favorably on the application for exemption under section 501(c)(3) of an incorporated group practice that was "organized and operated as an integral part of the University of Massachusetts Medical School and of the University of Massachusetts Hospital at Worcester." *Id.* at 1300. The Court stated:

By organizing the clinical faculty of the medical school into a cohesive group, and by promoting an efficient mechanism for the collection of fees charged to the patients of the university hospital for services rendered by the clinical faculty, petitioner effectuates its exempt purpose of promoting and improving the education received by students of the medical school. [*Id.* at 1306.]

*B.H.W. Anesthesia Found., Inc. v. Commissioner, supra,* and *University of Mass. Med. School Group Practice v. Commissioner, supra,* were followed in *University of Maryland Physicians, P.A. v. Commissioner,* T.C. Memo. 1981-23, in which the exemption was based on the charitable activities of the entity itself. The Court stated:

It is clear that petitioner is organized and operated for charitable, educational, and scientific purposes. Through its shareholder-employees, petitioner delivers health care to the general public; renders services without charge to the indigent; provides vital clinical training to the Medical School's students, interns, and residents; and engages in medical research for the advancement of the healing arts. All of these functions serve exempt purposes. [*Id.*]

Anesthesiology services or faculty medical activities are essential to the operation of a hospital or a medical school. In the foregoing group practice cases, all services were rendered to patients of the exempt entity and furthered exempt purposes. The disputes apparently arose because of benefits realized by those persons performing the services. Thus, the cases are not controlling in the circumstances that we have here. The Court of Appeals for the Third Circuit has already ruled that petitioner benefited only its subscribers and therefore was not operated exclusively for an exempt purpose. For the group practice cases to apply here, the population of subscribers would have to overlap substantially with the patients of the related exempt entities. The facts indicate that it does not.

Although both parties refer to the question of whether petitioner's activities would constitute an unrelated business if conducted by petitioner's affiliate, neither party analyzes that issue in depth. Respondent merely cites a series of revenue rulings, stating:

> Petitioner is precluded from exemption under the integral part theory because its activities would be an unrelated trade or business if conducted by petitioner's related hospitals. Treas. Reg. sec. 1.502-1(b). When a hospital provides a service that is not the direct provision of hospital care, such as laboratory or pharmacy services, to the hospital's patients, it is not an unrelated trade or business, but when a hospital provides the same services to individuals who are not the hospital's patients, it is an unrelated trade or business. Rev. Rul. 68-374, 1968-2 C.B. 242; Rev. Rul. 68-375, 1968-2 C.B. 245; Rev. Rul. 68-376, 1968-2 C.B. 246. Petitioner's subscribers do not become patients of petitioner's related hospitals merely by virtue of being petitioner's subscribers. Rev. Rul. 68-374, 1968-2 C.B. 242; Rev. Rul. 68-375, 1968-2 C.B. 245; Rev. Rul. 68-376, 1968-2 C.B. 246; Rev. Rul. 85-110, 1985-2 C.B. 166. When petitioner's subscribers seek medical treatment from one of petitioner's affiliates, they may become patients of that affiliate, but they do not become patients of the affiliate merely by the act of subscribing to petitioner's HMO. Therefore, under the published precedent regarding hospitals, petitioner's HMO would be an unrelated trade or business if conducted by GMC or GWV except when the subscribers are actually admitted to one of the hospitals.

Petitioner argues that, because an HMO would not be an unrelated trade or business in the hands of the clinic, GMC, or GWV, an HMO in petitioner's hands is exempted under the integral part doctrine. Petitioner argues that, if petitioner's HMO were operated by the clinic, it would have more chari-

table characteristics than the HMO involved in *Sound Health Association v. Commissioner,* 71 T.C. 158 (1978), found by this Court to be exempt under section 501(c)(3). The Commissioner has acquiesced in our conclusion in *Sound Health Association,* 1981-2 C.B 2, and the Court of Appeals for the Third Circuit, although indicating that in some respects this Court went too far in *Sound Health Association,* has not disturbed the holding of that case.

Section 513(a) defines "unrelated trade or business" as "any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of * * * [the] purpose or function constituting the basis for its exemption". The statute directs focus on the manner in which the tax-exempt organization operates its business. *United States v. American College of Physicians,* 475 U.S. 834, 848-849 (1986).

Normally, revenue rulings are merely the interpretation of one of the parties to the litigation and are not given precedential effect. See, e.g., *Stark v. Commissioner,* 86 T.C. 243, 250-251 (1986). The Court of Appeals in this case has said, and we recognize, that the interpretations of the Commissioner must be given weight in this context. *Geisinger Health Plan v. Commissioner,* 985 F.2d 1210, 1215 n.2, 1216 (3d Cir. 1993), revg. T.C. Memo. 1991-649; see also *Sound Health Association v. Commissioner,* 71 T.C. at 178-186. The revenue rulings, and the analogous cases that we have found in the unrelated business income context, consider the degree to which income is earned from services rendered or sales made to persons who are not patients of the exempt affiliated entity. See, e.g., *Hi-Plains Hosp. v. United States,* 670 F.2d 528 (5th Cir. 1982); *Carle Found. v. United States,* 611 F.2d 1192 (7th Cir. 1979); Rev. Rul. 68-374, 1968-2 C.B. 242; Rev. Rul. 68-375, 1968-2 C.B. 245; Rev. Rul. 68-376, 1968-2 C.B. 246; Rev. Rul. 69-267, 1969-1 C.B. 160; Rev. Rul. 69-268, 1969-1 C.B. 160; Rev. Rul. 69-269, 1969-1 C.B. 160; Rev. Rul. 78-435, 1978-2 C.B. 181.

Given the existence of sales to and services performed for persons who are not patients of the exempt entities within the Geisinger system, we must determine whether petitioner's overall operations are "substantially related to the

exempt function" of its exempt affiliates. If petitioner's activities are "conducted on a scale larger than is 'reasonably necessary'" to accomplish the purposes of the exempt entities, there is no substantial relationship within the meaning of the regulations. *Hi-Plains Hospital v. United States,* 670 F.2d at 530-531; sec. 1.513-1(d)(3), Income Tax Regs.

The pertinent facts include that the clinic compensated all of the physicians who provided services to petitioner's subscribers, whether employees of the clinic or persons contracting with the clinic; that petitioner contracted for hospital services with GMC and GWV and with 20 other hospitals, but, for the fiscal year ended June 30, 1987, 80 percent of all hospital services rendered to petitioner's subscribers were provided by GMC and GWV; and that petitioner contracted with GSS to provide to petitioner office space, supplies, and administrative services, including payroll, personnel administration, accounting, and data processing services. The record does not, however, justify a conclusion as to whether the instances in which petitioner's subscribers were served by unrelated entities were substantial or insubstantial. Although, conceivably, services provided by unrelated hospitals were dependent on the availability of particular specialized services at various facilities, were based on geographical expediency, or were otherwise minimal, the record does not allow us to reach a conclusion in that regard. We cannot conclude on the administrative record that, with respect to the integral part doctrine, the Commissioner erred in determining that petitioner was not entitled to exempt status. See Rule 217(c)(2)(A); *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 356 (1978).

In cases involving questions of whether certain income is or is not subject to tax as unrelated business income, it is possible to allocate income so that income from sales to customers or patients of an exempt organization is separated from income from sales to unrelated customers or patients. In this instance, however, the issue of whether petitioner is an integral part of the Geisinger system does not permit allocation. The organization itself is either entitled to an exemption or is not entitled to an exemption. Faced with the conclusion of the Court of Appeals that its activities served the private purposes of its members, we cannot conclude that petitioner's operations were so substantially and closely

related to the exempt purposes of its affiliates that those private interests may be disregarded.

Pursuant to the opinion of the Court of Appeals for the Third Circuit and in accordance with the foregoing,

*Decision will be entered for respondent.*