

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-27-1994

# Geisinger Health Plan v. Comm. IRS

Precedential or Non-Precedential:

Docket 93-7699

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Geisinger Health Plan v. Comm. IRS" (1994). *1994 Decisions.* Paper 95.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/95

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-7699
_____


GEISINGER HEALTH PLAN

Appellant,

vs.

COMMISSIONER OF INTERNAL REVENUE SERVICE

Appellee.

_____

APPEAL FROM THE DECISION OF
THE UNITED STATES TAX COURT

(No. 90-20793)
_____


ARGUED MAY 19, 1994

BEFORE:  BECKER and LEWIS, Circuit Judges,
and IRENAS, District Judge.[0]

(Filed July 27, 1994)

_____

Lawrence J. Goode
Frederick J. Gerhart (ARGUED)
Melissa B. Rasman
Dechert Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania  19103-2793

_____    Attorneys for Appellant

[0]*    Honorable Joseph E. Irenas, United States District Judge for
        the District of New Jersey, sitting by designation.


1

Gary R. Allen
Teresa E. McLaughlin (ARGUED)
United States Department of Justice
Tax Division
P. O. Box 502
Washington, D.C.  20044

          Attorneys for Appellee

_____

OPINION OF THE COURT
_____


LEWIS, Circuit Judge.

          In Geisinger Health Plan v. Commissioner of Internal
Revenue, 985 F.2d 1210 (3d Cir. 1993) ("Geisinger I"), we held
that the Geisinger Health Plan ("GHP"), a health maintenance
organization ("HMO"), was not entitled to exemption from federal
income taxation as a charitable organization under 26 U.S.C.
§ 501(c)(3).  We remanded the case for determination of whether
GHP was entitled to exemption from taxation by virtue of being an
integral part of the Geisinger System (the "System"), a
comprehensive health care system serving northeastern and
northcentral Pennsylvania.  We will affirm the Tax Court's
decision that it is not exempt as an integral part of the System.

                              I.

          GHP is a prepaid health care plan which contracts with
health care providers to provide services to its subscribers. The
facts relevant to GHP's function are detailed in our opinion in
Geisinger I, and we need not repeat them here.  Instead, far more

2

relevant to this appeal is GHP's relationship with the Geisinger System and its other constituent entities, a relationship which we must examine in some detail to decide the issue before us.

The Geisinger System consists of GHP and eight other nonprofit entities, all involved in some way in promoting health care in 27 counties in northeastern and northcentral Pennsylvania. They are: the Geisinger Foundation (the "Foundation"), Geisinger Medical Center ("GMC"), Geisinger Clinic (the "Clinic"), Geisinger Wyoming Valley Medical Center ("GWV"), Marworth, Geisinger System Services ("GSS") and two professional liability trusts. All of these entities are recognized as exempt from federal income taxation under one or more sections of the Internal Revenue Code.

The Foundation controls all these entities, as well as three for-profit corporations. It has the power to appoint the corporate members of GHP, GMC, GWV, GSS, the Clinic and Marworth, and those members elect the boards of directors of those entities. The Foundation also raises funds for the Geisinger System. Its board of directors is composed of civic and business leaders in the area.

GMC operates a 569-bed regional medical center. As of March 31, 1988, it had 3,512 employees, including 195 resident physicians and fellows in approved postgraduate training programs. It accepts patients without regard to ability to pay, including Medicare, Medicaid and charity patients. It operates a full-time emergency room open to all, regardless of ability to pay. It also serves as a teaching hospital.

3

GWV is a 230-bed hospital located in Wilkes-Barre, Pennsylvania. It accepts patients regardless of ability to pay, and it operates a full-time emergency room open to all, regardless of ability to pay.

The Clinic provides medical services to patients at 43 locations throughout the System's service area. It also conducts extensive medical research in conjunction with GMC and physicians who perform medical services for GMC, GWV and other entities in the Geisinger System. As of March 31, 1988, it employed 401 physicians. It accepts patients without regard to their ability to pay.

Marworth operates two alcohol detoxification and rehabilitation centers and offers educational programs to prevent alcohol and substance abuse.

GSS employs management and other personnel who provide services to entities in the Geisinger System.

As we noted in Geisinger I, the Geisinger System apparently decided to create GHP after GMC experimented with a pilot prepaid health plan between 1972 and 1985. The experience was positive, and the Geisinger System formed GHP to provide its own prepaid health plan.

It organized GHP as a separate entity within the System (as opposed to operating it from within the Clinic, GMC or GWV) for three reasons. First, HMOs in Pennsylvania are subject to extensive regulation by the Commonwealth's Departments of Health and Insurance. See generally 40 P.S. §§ 1551 et seq. Operating GHP separately enables other entities in the System to avoid

4

having to comply with the burdensome requirements associated with that regulation. Second, those administering the System believe it preferable for GHP's organization and management to remain separate from those of the System's other entities because it serves a wider geographic area than any of those other entities. Finally, under Pennsylvania law at least one-third of GHP's directors must be subscribers. 28 Pa. Code § 9.96(a). Establishing GHP as a separate entity avoids disrupting the governance of the other Geisinger System entities to comply with this requirement. For example, establishing an HMO within GMC would have required GMC to canvass its board of directors to ensure that one-third of them subscribed to the HMO. If they did not, GMC would have had to amend its by-laws or other governing documents to add directorships so that one-third of the directors were subscribers. Incorporating GHP separately eliminates the need for such reorganization.

For the year which ended June 30, 1987, GHP generated 8.8 percent of the aggregate gross receipts of the five health care providers[0] in the Geisinger System. At the time this case was first submitted to the Tax Court, projections indicated that by June 30, 1991, GHP would generate 14.35 percent of the System's aggregate gross receipts.[0]

---

[0] These are GHP, GMC, GWV, the Clinic and Marworth. GHP is included among these five health care "providers" although, as noted in Geisinger I, GHP itself provides no health care but instead arranges that its subscribers will receive health care from others. Geisinger I, 985 F.2d at 1213.

[0] Because it is likely that many GHP subscribers would have used Geisinger facilities before purchasing GHP coverage (as insureds of Blue Cross or private insurers), this percentage

5

GHP's interaction with other Geisinger System entities is varied. Its most significant contact is with the Clinic, from which it purchases the physician services its subscribers require by paying a fixed amount per member per month, as set forth in a Medical Services Agreement. Eighty-four percent of physician services are provided by doctors who are employees of the Clinic; the remaining 16 percent are provided by doctors who are not affiliated with the Clinic but who have contracted with the Clinic to provide services to GHP subscribers. GHP has similarly entered into contracts with GMC and GWV, as well as 20 non-related hospitals. When its subscribers require hospital care, these hospitals provide it pursuant to the terms of their contracts, for either a negotiated per diem charge or a discounted percentage of billed charges. GHP has also contracted with GSS to purchase office space, supplies and administrative services.

Except in emergency situations, only physicians who either work for the Clinic or have contracted with the Clinic may order that a GHP subscriber be admitted to a hospital. When such admission is ordered, it generally must be to GMC, GWV or one of the 20 other hospitals with which GHP has contracted. The only exceptions to this requirement are in a medical emergency outside of GHP's service area or when approved in advance by GHP's medical director; in those instances, a subscriber may be

does not necessarily represent a net increase in utilization of Geisinger facilities by virtue of GHP's existence.

6

admitted to a hospital with which GHP has no contractual relationship.

GHP has also entered into contracts with pharmacies, durable medical equipment suppliers, ambulance services and physical therapists. Those entities' services are available to subscribers only (1) in a medical emergency or (2) when prescribed by a doctor who is employed by the Clinic or who is under contract with the Clinic to provide care to GHP subscribers.

The Tax Court considered GHP's role in the Geisinger System when, on remand from Geisinger I, it decided that GHP did not qualify for exempt status under the integral part doctrine. Geisinger Health Plan v. Commissioner of Internal Revenue, 100 T.C. 394 (1993) ("Geisinger II"). The court first distinguished a series of "group practice cases," in which incorporated groups of doctors on hospital or faculty medical staffs were held to be exempt from taxation as integral parts of the tax-exempt hospitals or medical schools with which they were associated. The Tax Court found that those cases did not control its decision because "[f]or [them] to apply here, the population of [GHP's] subscribers would have to overlap substantially with the patients of the related exempt entities [and t]he facts indicated that it does not." Geisinger II, 100 T.C. at 404. Moreover, it held, GHP was not entitled to tax-exempt status as an integral part of the System because it would produce unrelated business income for the Clinic, GMC or GWV if one of those entities were to absorb its activities. Id. at 404-06. A timely appeal followed; as

7

noted previously, we will affirm, although we will do so on grounds which differ from those on which the Tax Court rested. Specifically, because we deem it unnecessary to decide, we will not reach the issue whether GHP would produce unrelated business income if it were part of some entity created by merging its operations with one of the other Geisinger System entities.

## II.

Generally, separately incorporated entities must qualify for tax exemption on their own merits. Mutual Aid Association of the Church of the Brethren v. United States, 759 F.2d 792, 795 n.3 (10th Cir. 1985); cf. Moline Properties, Inc. v. Commissioner of Internal Revenue, 319 U.S. 436 (1943). In Geisinger I, we decided that GHP cannot qualify for tax exemption on its own merits. The question before us now is whether it comes within the "integral part doctrine," which may best be described as an exception to the general rule that entitlement to exemption is derived solely from an entity's own characteristics. See Internal Revenue Service ("IRS") brief at 20 (regulation providing basis for doctrine "implies that an organization whose sole activity is an `integral part' of the exempt activities of a related charity may derive its exemption from that of its affiliate"). As it did with the issue of whether it was entitled to exemption standing alone, see Geisinger I, 985 F.2d at 1214, GHP bears the burden of proving entitlement to exemption under the integral part doctrine. Also as in Geisinger I, 985 F.2d at 1212, we will apply plenary review, both because of the stipulated administrative nature of the record and because we

8

focus on a test which differs from that upon which the Tax Court relied in rendering its decision. Cf. Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 855 n.15 (1982) (citing United States v. Singer Manufacturing Co., 374 U.S. 174, 194–95 n.9 (1963) (even when reviewing findings of fact subject to clearly erroneous review, appellate court may decide case as a matter of law if the factfinder applied an improper standard to the facts)).

A.

In Geisinger I, we described the integral part doctrine as follows:

> The integral part doctrine provides a means by which organizations may qualify for exemption vicariously through related organizations, as long as they are engaged in activities which would be exempt if the related organizations engaged in them, and as long as those activities are furthering the exempt purposes of the related organizations.

Geisinger I, 985 F.2d at 1220. The Tax Court on remand stated:

> The parties agree that an organization is entitled to exemption as an integral part of a tax-exempt affiliate if its activities are carried out under the supervision or control of an exempt organization and could be carried out by the exempt organization without constituting an unrelated trade or business.

Geisinger II, 100 T.C. at 402; see 26 C.F.R. §1.502–1(b).

GHP argues that these statements require us to examine whether the Clinic or GMC could retain tax-exempt status if it were to absorb GHP. It thus compares the attributes of a hypothetically merged Clinic/GHP or GMC/GHP entity to the attributes of the HMO held to be exempt in Sound Health

9

<u>Association v. Commissioner</u>, 71 T.C. 158 (1978), <u>acq</u>. 1981-2 C.B. 2.[0] Concluding that the merged entity would display more indicia of entitlement to exemption than the <u>Sound Health</u> HMO, GHP urges that it is exempt because of the characteristics of the hypothetical merged entity. Despite its superficial appeal, we reject this argument and hold that the integral part doctrine does not mean that GHP would be exempt solely because either GMC or the Clinic could absorb it while retaining <u>its</u> tax-exempt status. While this is a necessary condition to applying the doctrine, it is not the only condition. GHP is separately incorporated for reasons it found administratively and politically advantageous. While it may certainly benefit from that separate incorporation, it must also cope with the consequences flowing from it. <u>Cf</u>. <u>Moline Properties</u>, 319 U.S. at 438-39.

We acknowledge that interpreting the integral part doctrine in the manner GHP urges might enable entities to choose their organizational structures based on efficiency concerns rather than perverting those concerns by making tax considerations relevant. In our view, however, there are countervailing policy concerns which justify determining each entity's tax status based upon its own organizational structure.

---

[0] In <u>Sound Health</u>, the Tax Court ruled exempt an HMO which charged subscribers fees based upon a community rating system, subsidized the dues of subscribers who could not afford to pay, provided health care services (sometimes at no or a reduced charge) to both subscribers and members of the general public, treated emergency patients regardless of ability to pay and offered public educational programs regarding health.

10

It is less complex and more certain for courts and administrators to assess an entity's tax status in light of its unique organizational composition and its association with another entity, and only to have to take into account some hypothetical combination of organizations as a second step in those relatively rare instances when an organization meets the other precondition of integral part status we set forth below. See II.C. infra. We recognize that it may appear overly technical to tax GHP differently from a GMC/GHP or a Clinic/GHP combination, for instance, merely because it is incorporated separately. On the other hand, to tax GHP differently merely because it is related to those entities, without searching for indicia that its association with them enhances its own tax-exempt characteristics, would be inconsistent with the narrow construction generally accorded tax exemptions. See Bingler v. Johnson, 394 U.S. 741, 752 (1969); Commissioner of Internal Revenue v. Jacobson, 336 U.S. 28, 48-49 (1949); Storall Manufacturing Co., Inc. v. United States, 755 F.2d 664, 665 (8th Cir. 1985).

Accordingly, we will determine whether GHP is exempt from taxation when examined not only in the context of its relationship with the other entities in the System, but also based upon its own organizational structure. In doing so, we bear in mind that we are not bound by the description of the integral part doctrine set forth in dicta in Geisinger I.

B.

11

As the Tax Court recognized, 100 T.C. at 401, the integral part doctrine is not codified. Its genesis may be found in a phrase contained within a regulation which speaks of a subsidiary being exempt "on the ground that its activities are an integral part of the activities of the parent organization." 26 C.F.R. § 1.502-1(b); see generally General Counsel Memorandum 39,830 (August 30, 1990).[0] This reference to the doctrine is only fully understood, however, when one considers it in the context of the regulation and the statute it implements. Section 502 of the Internal Revenue Code (the "feeder organization rule") provides that an organization engaged in a trade or business for profit will be taxed even if it pays all of its profits over to an exempt organization. 26 U.S.C. § 502(a). See generally 9 Merten's Law of Federal Income Taxation § 34.01 at 5. The regulation interpreting this section of the Code makes clear that

> [i]n the case of an organization operated for the primary purpose of carrying on a trade or business for profit, exemption is not allowed . . . on the ground that all the profits of such organization are payable to one or more [exempt] organizations . . . .

26 C.F.R. § 502-1(b).

The integral part doctrine arises from an exception to this "feeder organization" rule. Regulation 502-1(b) states that despite the general rule of taxation of "feeder organizations,"

---

[0]  We cite this General Counsel memorandum, which was issued in connection with GHP's application for exemption, Loren Callan Rosenzweig, Geisinger, HMOs and Health Care Reform, Taxes, January 1994, at 20, 23 n.27, as providing helpful background regarding the integral part doctrine. We do not adopt its legal conclusions.

12

> [i]f a subsidiary organization of a tax-exempt organization <u>would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization</u>, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with the parent organization[.]

26 C.F.R. § 1.502-1(b) (emphasis added). To illustrate how this exemption might apply to an entity, the regulation describes "a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt organization, in carrying out its educational activities." Id.[0] See also Rev. Rul. 78-41, 1978-1 C.B. 148 (trust existing solely as a repository of funds set aside by nonprofit hospital for the payment of malpractice claims against the hospital, and as the payor of those claims, was exempt as an integral part of the hospital); Rev. Rul. 63-235, 1963-2 C.B. 210 (incidental publication and sale of law journals did not prevent journal corporation from being exempt as "adjunct to" an exempt law school); Rev. Rul. 58-194, 1958-1 C.B. 240 (bookstore used almost exclusively by university faculty and students was exempt as an integral part of the university with which it was associated).

GHP contends that as long as it would not generate unrelated business income if it were merged into any one of the other Geisinger System entities, it is exempt as an integral part of the System. The Tax Court, in fact, utilized unrelated

---

[0] Although the regulation speaks in terms of parent and subsidiary entities, the IRS does not contend that we should consider only GHP's relationship with its parent, the Foundation, in deciding this appeal.

13

business income concepts in analyzing GHP's claim for exemption. See <u>Geisinger II</u>, 100 T.C. at 404-07 (citing, <u>inter alia</u>, <u>Hi-Plains Hospital v. United States</u>, 670 F.2d 528 (5th Cir. 1982); <u>Carle Foundation v. United States</u>, 611 F.2d 1192 (7th Cir. 1979)).  We agree that an entity seeking exemption as an integral part of another cannot primarily be engaged in activity which would generate more than insubstantial unrelated business income for the other entity.  That much is demonstrated by the remainder of 26 C.F.R. § 1.502-1(b), which cautions that

> the subsidiary organization is not exempt
> from tax if it is operated for the primary
> purpose of carrying on a trade or business
> which would be an unrelated trade or business
> (that is, unrelated to exempt activities) if
> regularly carried on by the parent
> organization.  For example, if a subsidiary
> organization is operated primarily for the
> purpose of furnishing electric power to
> consumers other than its parent organization
> (and the parent's tax-exempt subsidiary
> organizations), it is not exempt since such
> business would be an unrelated trade or
> business if regularly carried on by the
> parent organization.  Similarly, if the
> organization is owned by several unrelated
> exempt organizations, and is operated for the
> purpose of furnishing electric power to each
> of them, it is not exempt since such business
> would be an unrelated trade or business if
> regularly carried on by any one of the
> tax-exempt organizations.

<u>Id</u>.

Although 26 C.F.R. § 502-1(b) clearly makes the absence of activity constituting an unrelated trade or business a necessary qualification for the operation of the integral part doctrine, because this regulation speaks in terms of disqualification from exemption rather than qualifications for

14

exemption, it does not indicate or explain whether there are any other necessary qualifications -- the issue we face in this case.

Both the revenue rulings cited earlier and case law similarly fail to state a comprehensive rule to assist in determining when an entity is exempt as an integral part of another. In Squire v. Students Book Corp., 191 F.2d 1018 (9th Cir. 1951), for example, the court ruled that a corporation operating a bookstore and restaurant which sold college texts, was wholly owned by a college, used college space free of charge, served mostly faculty and students, and devoted its earnings to educational purposes was exempt because it "obviously bears a close and intimate relationship to the functioning of the [c]ollege itself." Squire, 191 F.2d at 1020. It did not, however, provide further explication for its rationale. See also University of Maryland Physicians, P.A. v. Commissioner of Internal Revenue, 41 T.C.M. (CCH) 732 (1981); University of Massachusetts Medical School Group Practice v. Commissioner of Internal Revenue, 74 T.C. 1299 (1980), acq. 1980-2 C.B. 2; B.H.W. Anesthesia Foundation, Inc. v. Commissioner of Internal Revenue, 72 T.C. 681 (1979), nonacq. 1980-2 C.B. 2; B.S.W. Group, Inc. v. Commissioner of Internal Revenue, 70 T.C. 352 (1978); Brundage v. Commissioner of Internal Revenue, 54 T.C. 1468 (1970), acq. in result 1970-2 C.B. xix (addressing "integral part" issue in deduction context).

C.

Distilling § 1.502-1(b) and these cases into a general rule leads us to conclude that a subsidiary which is not entitled

15

to exempt status on its own may only receive such status as an integral part of its § 501(c)(3) qualified parent[0] if (i) it is not carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent, and (ii) its relationship to its parent somehow enhances the subsidiary's own exempt character to the point that, when the boost provided by the parent is added to the contribution made by the subsidiary itself, the subsidiary would be entitled to § 501(c)(3) status.

Whether income received by an HMO operated by an entity which also directly operates a health care facility would be deemed unrelated business income was answered in the negative by Sound Health. Nevertheless, this is a complex issue which will probably be further explored by the courts and Congress as the entities which pay for health care, and those which provide it, begin to intertwine. Because we find that GHP does not meet the second prong of the integral part test articulated above, we need not probe the legal soundness of the Sound Health opinion.

In considering whether the boost received by GHP from its association with GMC or the Clinic might be sufficient, when added to its own contribution, to merit § 501(c)(3) treatment, we must first look at the nature of the boost which was sufficient in those instances where the integral part doctrine has been

---

[0]     Although we refer to the entity seeking application of the integral part doctrine as the "subsidiary" and the current holder of the § 501(c)(3) exemption as the "parent," we recognize that the relationship, as in this case, may be that of entities controlled by a common parent or some other form of affiliation.

16

applied. The electric company discussed in 26 C.F.R. § 502-1(b), for example, would not be entitled to an exemption standing alone, because the provision of electric power to others is not a charitable purpose.

However, the fact that the electric company is a subsidiary of an exempt university eliminates the characteristic which prevented the company from being exempt on its own. As a subsidiary of the university, the electric company acquires the purpose of the university -- it produces electricity solely for the purpose of allowing education to occur.[0] The "boost" it receives from its association with the educational institution transforms it from a company without to a company with a charitable purpose and thus enables it to qualify for tax-exempt status as an integral part of that institution. Like the electric company, the bookstores in <u>Squire</u> and Rev. Rul. 58-194, and the law journal in Rev. Rul. 63-235 had insufficiently charitable purposes to qualify for exempt status when considered alone. Selling books or a journal to the general public is not educational enough to qualify for exempt status as a charitable institution. But because these particular bookstores and this particular law journal were subsidiaries of universities and aided the universities' exempt missions of educating their students, the purposes of the bookstores and journal became more

---

[0]   The regulation presupposes that the entity seeking exemption derives a profit from serving its parent. 26 C.F.R. § 502-1(b).

17

charitable, and they were entitled to an exemption.[0]  Absent

receipt of such a "boost," we do not think that an institution is

entitled to a tax exemption as an integral part.  To hold

otherwise might enable an organization that is not entitled to an

exemption on its own to become tax-exempt merely because it

happens to be controlled by an organization that is itself

exempt.

---

[0]  As noted previously, see infra page 14, Rev. Rul. 78-41, 1978-1 C.B. 148 provides another example of a situation in which the IRS has ruled that an organization is exempt as an integral part of its parent's exempt functions.  In Rev. Rul. 78-41, the IRS ruled that a trust existing solely as a repository of funds set aside by a nonprofit hospital for the payment of malpractice claims against the hospital, and as the payor of those claims, was exempt as an integral part of the hospital.  To some extent, this revenue ruling is consistent with our understanding of the integral part doctrine based upon the statute and the case law:  A trust established to pay claims may not be charitable standing alone, but by collecting funds for the payment of, and paying, solely the malpractice claims filed against a nonprofit hospital, this trust was serving the hospital's charitable purpose of promoting health by enhancing the hospital's ability to continue in business.  Cf. Rev. Rul. 73-313, 1973-2 C.B. 174 (organization created to build and offer medical office building and facilities at a reasonable rent to attract a doctor to an isolated area which previously lacked medical services was "a method of promoting health in the legal sense of the term in the law of charity and, therefore, a charitable purpose").  It is also true, however, that to some extent this revenue ruling conflicts with 26 U.S.C. § 502 and 26 C.F.R. § 1.513-1(d)(3), which, taken together, provide that the financing of exempt activities neither renders otherwise taxable entities exempt from taxation nor transforms unrelated business income into income which is substantially related to an exempt purpose and is thus exempt from taxation.  Because of the tension we perceive between this revenue ruling and the statute and regulations, we will not rely on Rev. Rul. 78-41 in our analysis.

Here, we do not think that GHP receives any "boost" from its association with the Geisinger System. In Geisinger I, we determined that while GHP helps to promote health, it does not do so for a significant enough portion of the community to qualify for tax-exempt status on its own. See Geisinger I, 985 F.2d at 1219-20. Cf. Rev. Rul. 69-545, 1969-2 C.B. 117 (promotion of health is a charitable purpose "provided that the class [served] is not so small that its relief is not of benefit to the community"). And, unlike the electric company, university bookstores or law journal in the regulations and case law, the contribution that GHP makes to community health is not increased at all by the fact that GHP is a subsidiary of the System rather than being an independent organization which sends its subscribers to a variety of hospitals and clinics.

As our examination of the manner in which GHP interacts with other entities in the System makes clear, its association with those entities does nothing to increase the portion of the community for which GHP promotes health -- it serves no more people as a part of the System than it would serve otherwise. It may contribute to the System by providing more patients than the System might otherwise have served, thus arguably allowing the System to promote health among a broader segment of the community than could be served without it, but its provision of patients to the System does not enhance its own promotion of health; the patients it provides -- its subscribers -- are the same patients it serves without its association with the System. To the extent it promotes health among non-GHP-subscriber patients of the

19

System, it does so only because GHP subscribers' payments to the System help finance the provision of health care to others. An entity's mere financing of the exempt purposes of a related organization does not constitute furtherance of that organization's purpose so as to justify exemption. Cf. 26 U.S.C. § 502 ("[a]n organization . . . shall not be exempt from taxation under section 501 on the ground that all of its profits are payable to one or more organizations exempt from taxation under section 501"). Thus, it is apparent that GHP merely seeks to "piggyback" off of the other entities in the System, taking on their charitable characteristics in an effort to gain exemption without demonstrating that it is rendered "more charitable" by virtue of its association with them.

## D.

It has not escaped our attention, of course, that both our decision today and our decision in Geisinger I may either set the tone for, or be superseded by, legislative activity in the near future. The executive and the legislative branches are currently debating the appropriate parameters of future governmental involvement in the provision and financing of health care in this country. The legislation which may result could significantly transform the structure and financing of health care delivery systems in ways both anticipated and unanticipated. Academic commentary on our decision in Geisinger I reinforces our common-sense impression that questions regarding the tax-exempt status of integrated delivery systems under 26 U.S.C. § 501(c)(3) may be addressed during these debates. See generally Loren

20

Callan Rosenzweig, <u>Geisinger, HMOs and Health Care Reform</u>, Taxes, January 1994, at 20; Kenneth L. Levine, <u>Geisinger Health Plan Likely to Adversely Affect HMOs and Other Health Organizations</u>, J. Taxation, August 1993, at 90.

Whatever changes are wrought by the legislature in the future, however, today we are constrained to apply the law in its current form and to construe tax exemptions narrowly. Our interpretation of the integral part route to exemption under section 501(c)(3) reflects those constraints. Obviously, we express no opinion as to whether HMOs, whether structured like GHP or like the <u>Sound Health</u> HMO, can or should be exempt from federal income taxation after whatever transformation of the health care industry may be forthcoming.

In sum, GHP does not qualify for exemption as an integral part of the Geisinger System because its charitable character is not enhanced by virtue of its association with the System.  We will affirm the decision of the Tax Court.