T.C. Memo. 2001-246


UNITED STATES TAX COURT


IHC HEALTH PLANS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14600-99X.          Filed September 19, 2001.


Douglas M. Mancino, James L. Malone III, and Robert C.
Louthian III, for petitioner.

Mark A. Weiner, Kirk M. Paxson, Don R. Spellman, and Kenneth
M. Griffin, for respondent.


MEMORANDUM OPINION

WELLS, Chief Judge: In a final adverse determination
letter, respondent determined that IHC Health Plans, Inc.
(petitioner) did not qualify as an organization described in
sections 501(c)(3) and 170(c)(2) and revoked petitioner's

exemption from Federal income taxation pursuant to section 501(a).  The revocation was retroactive to January 1, 1987. Unless otherwise indicated, section references are to sections of the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent revoked petitioner's tax-exempt status under section 501(c)(3) on the grounds that:  (1) Petitioner was not operated exclusively for a tax-exempt purpose; and (2) petitioner's activities were tantamount to providing commercial-type insurance within the meaning of section 501(m)(1). Petitioner filed a timely petition for declaratory judgment pursuant to section 7428(a) challenging respondent's determination letter.  At the time the petition was filed, petitioner's principal place of business was in Salt Lake City, Utah.

The administrative record was submitted to the Court pursuant to Rule 217(b)(1).  The facts contained in the administrative record are assumed to be true for purposes of this proceeding.  See Rule 217(b)(1).  The case was submitted to the Court by joint motion of the parties pursuant to Rule 122.  The parties also filed a stipulation of facts with attached exhibits. The parties agree that petitioner has satisfied all jurisdictional requirements.  See sec. 7428(b); Rule 210(c).

## Background

By way of a brief introduction, petitioner and its affiliates, IHC Care, Inc. (Care) and IHC Group, Inc. (Group), operated health maintenance organizations and were part of a number of companies composing the so-called Intermountain Health System. Petitioner offered health plans to individuals, employees of large and small employers, and Medicaid recipients. At the same time that respondent revoked petitioner's tax-exempt status, respondent denied Care's and Group's applications for exemption from Federal income taxation pursuant to section 501(a).[1] For completeness, we have provided a detailed description of the various entities composing the Intermountain Health System.

## I. The Intermountain Health System

## A. Intermountain Health Care, Inc.

Between 1882 and 1970, the Church of Jesus Christ of Latter-Day Saints (LDS Church) constructed or purchased 15 hospitals in Utah, Idaho, and Wyoming. Prior to 1970, LDS Church hospitals functioned autonomously with little coordination or centralized management.

---

[1] Respondent's determinations to deny IHC Care, Inc.'s and IHC Group, Inc.'s applications for tax-exempt status are the subjects of the Court's opinions in IHC Care, Inc. v. Commissioner, T.C. Memo. 2001-248, and IHC Group, Inc. v. Commissioner, T.C. Memo. 2001-247.

During 1970, LDS Church organized Health Services Corporation, later renamed Intermountain Health Care, Inc. (IHC), as a nonprofit corporation under the laws of the State of Utah. LDS Church organized IHC for the purpose of assuming ownership and control of its hospitals and to oversee its worldwide health program. Respondent recognized IHC as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a).

During 1975, LDS Church determined that its hospitals were not central to its mission and subsequently transferred control of IHC to an independent board of trustees. Between 1975 and the early 1980s, IHC continued to operate its existing hospitals while it constructed or acquired additional hospitals. At the same time, IHC began the process of centralizing its management, coordinating its services, restructuring its debt, and undertaking other steps that its management deemed necessary for IHC to become an integrated multihospital system capable of expanding its services, achieving economies of scale, and improving operational efficiency.

During the early 1980s, in response to myriad changes in the health care field, IHC decided to restructure its operations, which restructuring included the formation of several affiliates. In February 1983, the Internal Revenue Service issued a private letter ruling to IHC approving its corporate reorganization plan.

B. <u>IHC Health Services, Inc.</u>

In 1983, IHC transferred its hospitals and substantially all its remaining operating assets, together with substantially all its outstanding tax-exempt debt and other liabilities, to IHC Health Services, Inc. (Health Services), a newly formed nonprofit affiliate. As a result of this reorganization, IHC ceased to operate hospitals and assumed the position of a parent company overseeing the operations of several nonprofit and for profit affiliates. IHC was Health Services' sole member.

Health Services was IHC's principal health care delivery organization. During 1994, Health Services began to conduct its activities through two divisions, the hospital division and the physician division, which are described in detail below.

1. <u>The Hospital Division</u>

As of December 31, 1999, the hospital division comprised 22 hospitals (including 2,644 licensed beds) located in Utah and Idaho. All of Health Services' hospitals, with the exception of Primary Children's Medical Center (Primary Children's) and McKay-Dee Institute for Behavioral Medicine (McKay-Dee Institute), were general acute care hospitals that provided inpatient and outpatient services, and varying levels of emergency, ancillary, and specialized services.

Primary Children's specialized in pediatric care in the Intermountain West (defined generally as the area covering

eastern Nevada, western Colorado, and the States of Utah, Idaho, Wyoming, and Montana).  The McKay-Dee Institute operated a free-standing psychiatric and behavioral health facility located in Ogden, Utah.  LDS Hospital, Health Services' largest hospital, located in Salt Lake City, Utah, provided a number of specialized medical services, including open heart surgery, pulmonary medicine, and coronary care.

In addition to traditional hospital services, the hospital division conducted a wide range of special care programs, including women's services, InstaCare Centers, home health care services, ambulatory surgery centers, cardiac services, rehabilitation services, psychiatric services, and occupational health and mission services.  Health Services used its mission services as a means to serve the community's charitable needs.  Health Services provided quality management services by tracking measures for improvement in clinical care.

All Health Services hospitals participated in Medicare and Medicaid programs for inpatient and outpatient hospital services, and for a number of free-standing ambulatory care services such as ambulatory surgery, home health care, and kidney dialysis.  In 1998, Health Services was not reimbursed for approximately $254 million in medical care provided to patients covered by Medicare, Medicaid, and other governmental programs.  In 1997, 1998, and 1999, Health Services provided charity services to indigent

patients valued at $26,705,911, $31,287,743, and $33,449,669, respectively.

Health Services' hospital division employed approximately 120 physicians separate and apart from Health Services' physician division described below.  Hospital division physicians provided hospital-based services such as radiology, pathology, and in some cases emergency services.

2.  The Physician Division

As of December 31, 1999, the physician division employed approximately 300 primary care physicians (general internists, family practitioners, and pediatricians) and 100 specialist physicians (cardiologists, urologists, obstetricians-gynecologists, radiologists, and surgeons).  These physicians generally practiced in Health Services' clinics and other community-based settings.  The physician division also provided various ancillary and support services such as diagnostic imaging and laboratory services for patients treated in Health Services' clinics.

The physician division performed the physician credentialing function for Health Services' hospitals and IHC's various health maintenance organizations (described below).  All physicians who were granted privileges to practice medicine at Health Services' hospitals were also qualified to act as participating providers for IHC's health maintenance organizations.

Respondent recognized Health Services as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a), and as a public charity described in sections 509(a)(1) and 170(b)(1)(A)(iii).

C.  IHC Health Plans, Inc.

As a further step in its reorganization plan, IHC initially intended to organize an affiliate to provide professional, general liability, and worker's compensation insurance.  However, upon further reflection, IHC decided to create an affiliate to operate as a State-licensed health maintenance organization (HMO)[2].

IHC's decision was based on its consideration of an HMO's potential for generating medical care cost savings and

---

[2]  Utah Code Ann. sec. 31A-8-101(5) (1999 Repl.) defines the term "Health maintenance organization" as follows:

  (5) "Health maintenance organization" means any person, other than an insurer licensed under Chapter 7 or an individual who contracts to render professional or personal services that he performs himself, which:

    (a) furnishes at a minimum, either directly or through arrangement with others, basic health care services to an enrollee in return for prepaid periodic payments agreed to in amount prior to the time during which the health care may be furnished; and

    (b) is obligated to the enrollee to arrange for or to directly provide available and accessible health care.

recognition that HMOs were gaining in popularity.  IHC also decided to organize an affiliate to operate as an HMO in order to gain practical experience, to attempt to realize its own cost savings by enrolling IHC employees in the HMO, and to counter a potential competitive threat posed by the combination of national for-profit hospital chains and HMOs (and their perceived capacity to direct large numbers of patients to Health Services' competitor hospitals).

During 1983, IHC organized petitioner as a nonprofit affiliate.  IHC was petitioner's sole corporate member. Petitioner's articles of incorporation stated that petitioner

> is  organized and shall be operated exclusively for charitable, educational or scientific purposes as described in section 501(c)(3) * * *.
>
> In furtherance of such purposes, the Corporation may develop and operate alternative health care delivery plans and financing systems to provide cost-effective and high quality care to participating employer groups and patients including elderly and disadvantaged persons, and conduct research and educational demonstration projects with various health care delivery systems.

The articles also stated that petitioner's business and affairs would be conducted by a board of trustees elected by IHC and composed of physicians, hospital personnel, and "buyer-employers"; i.e., employers offering petitioner's health plans to their employees.[3]  Petitioner was organized as a separate entity

---

[3]  Petitioner's By-Laws stated in pertinent part:

(continued...)

to comply with regulatory requirements and to simplify operations from an organizational and managerial standpoint.

Petitioner was licensed to operate an HMO in Utah and was permitted to offer a variety of individual and group health plans in the communities that it served.  In June 1985, respondent recognized petitioner as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a).

1.  IHC Care, Inc.

In January 1985, petitioner organized Care as a nonprofit affiliate for the purpose of establishing a federally qualified

---

[3](...continued)
The number of Trustees of the Corporation shall be not less than four (4) or more than twenty-three (23) persons, as determined from time to time by the Member. The initial number of trustees shall be eighteen (18). A plurality of Board members shall represent the buyer-employer community and an approximately equal number of physicians and hospital representatives shall be appointed.  Buyer-employer members shall be broadly representative of the major geographic areas and business interests (such as manufacturing, retailing, transportation, finance, utilities, education, etc.) to be served by the Corporation's health care delivery plans, and physician members shall also reflect such geographic areas as well as major medical specialties and modes of practice. * * *

direct contract model HMO.[4]  Petitioner was Care's sole corporate

---

[4]    HMOs are defined for purposes of Federal law under 42 U.S.C. sec. 300e(a) (1994) which provides:

(a) "Health maintenance organization" defined

        For purposes of this subchapter, the term "health maintenance organization" means a public or private entity which is organized under the laws of any State and which (1) provides basic and supplemental health services to its members in the manner prescribed by subsection (b) of this section, and (2) is organized and operated in the manner prescribed by subsection (c) of this section.

    42 U.S.C. sec. 300e(b)(1) (1994) provides in pertinent part that an HMO generally will provide basic health services to its members without limitations as to time or cost for a fixed payment from each member that is determined under a community rating system and is paid on a periodic basis without regard to the dates health services are provided.  42 U.S.C. sec. 300e(b)(2) (1994) provides that HMOs may also provide members with supplemental health services (defined in 42 U.S.C. sec. 300e-1(2) (1994)) for a separate fee that is fixed under a community rating system.

    42 U.S.C. sec. 300e(b)(3)(A) (1994) provides that at least 90 percent of physician services provided as basic health services to an HMO enrollee shall be provided through:  (1) the members of the HMO's physician staff (staff model HMO); (2) a medical group (medical group model HMO); (3) an individual practice association (IPA model HMO); (4) physicians who have contracted with the HMO for the provision of such services (direct contract model HMO), or (5) any combination of these models.  See Health Care Plan, Inc. v. Aetna Life Ins. Co., 966 F.2d 738, 739 n.3 (2d Cir. 1992); 42 C.F.R. sec. 417.100 (1991) (definitions); Boisture, Assessing The Impact Of Health Care Reform On The Formation Of Tax-Exempt Health Care Providers And HMO's, 62 Tax Notes 1181, 1184 (Feb. 28, 1994).

    42 U.S.C. sec. 300e(c)(1) (1994) provides that HMOs shall have a fiscally sound operation, adequate provision against the risk of insolvency, and assume full financial risk on a prospective basis for the provision of basic health services. However, 42 U.S.C. sec. 300e(c)(2) (1994) provides that HMOs may
(continued...)

member.

Care was licensed to operate an HMO in Utah.  In 1985, the Health Care Financing Administration (HCFA) recognized Care as a federally qualified HMO.

In 1985, Care filed with respondent an application for recognition as an organization that is exempt from taxation pursuant to section 501(c)(3).  In June 1999, respondent denied Care's application for tax-exempt status.

2.  IHC Group, Inc.

In July 1991, petitioner organized Group as a nonprofit affiliate for the purpose of establishing a federally qualified medical group model HMO.  Petitioner was Group's sole corporate member.

---

[4](...continued)
obtain insurance: (1) for the cost of providing a member with more than $5,000 in basic health services for any one year; (2) for the cost of basic health services provided to a member by a source outside the HMO due to an emergency; and (3) for not more than 90 percent of the amount by which its costs for any fiscal year exceeds 115 percent of its income.  Additionally, the section states that HMOs may enter into arrangements under which physicians and/or health care institutions assume all or part of the risk on a prospective basis for the provision to enrollees of basic health services.

Petitioner organized IHC Care, Inc., and IHC Group, Inc. (discussed below) as federally qualified HMOs to take advantage of marketing opportunities presented under the so-called dual choice mandate codified under 42 U.S.C. sec. 300e-9 (1976), which required certain employers (generally those with more than 25 employees) to offer their employees the option of enrolling in a federally qualified HMO.

Group was licensed to operate an HMO in Utah and Wyoming. In 1991, HCFA recognized Group as a federally qualified HMO.

In 1991, Group filed with respondent an application for recognition as an organization that is exempt from taxation pursuant to section 501(c)(3). In June 1999, respondent denied Group's application for tax-exempt status.

### 3. IHC Benefit Assurance Company

In May 1992, petitioner organized IHC Benefit Assurance Company (Benefit), a taxable business corporation, to underwrite traditional indemnity health insurance risks, particularly point-of-service options offered by petitioner, Care, and Group. Petitioner was Benefit's sole shareholder.

### 4. Management Services

Health Services provided management services to petitioner and its affiliates on a centralized basis, including legal services, human resources, public relations, and treasury functions. Each affiliate was subject to an annual intercompany overhead allocation charge for these services.

Petitioner provided general management and administrative services to Care and Group including marketing, sales, enrollment, customer service, claims processing, underwriting and actuarial services, provider relations and contracting, management information systems, and general accounting services.

Petitioner operated an office known as Network Services that negotiated and managed contracts between Health Services and insurance carriers, third-party administrators, and independent HMOs.

Petitioner employed between 600 and 700 employees during the 3-year period 1997 to 1999.

D.  IHC Foundation, Inc.

IHC organized IHC Foundation, Inc. (Foundation) to support IHC's and its tax-exempt affiliates' charitable, educational, and scientific activities.  Foundation received funds from grants, donations, and other sources.  Respondent recognized Foundation as an organization described in section 501(c)(3) that is exempt from taxation pursuant to section 501(a), and as a public charity pursuant to sections 509(a)(1) and 170(b)(1)(A)(vi).

E.  IHC Insurance Company, Inc.

IHC organized IHC Insurance Company, Inc., (Insurance) as a for-profit insurance company.  Insurance, which operated on Grand Cayman Island, provided IHC, Health Services, and petitioner with access to reinsurance coverage.

F.  Control

IHC had effective control of its affiliates, including Health Services, petitioner, Care, and Group, all of which were subject to the ultimate governance and control of IHC's board of trustees and corporate managers.  Health Services, petitioner,

Care, and Group shared many of the same corporate officers and trustees. IHC and its affiliates conducted their strategic planning, established their priorities, and attempted to implement their business plans on an enterprise basis, even though each entity had its own management team and budget.

II. Petitioner's Operations

A. In General

Petitioner operated as a State-licensed HMO offering health plans known as SelectMed, SelectMed Plus, IHC Care, IHC Care Plus, IHC Direct Care, IHC Direct Care Plus, Health Choice, and IHC Access. Petitioner collected premiums from its enrollees and, as petitioner did not itself provide health care services (as explained below), it arranged for its enrollees to receive comprehensive health care services, including preventive care, outpatient services, inpatient hospital services, emergency services, out-of-area services, and miscellaneous services such as ambulance and pharmacy services.

Petitioner, Care, and Group marketed several different health plans encompassing a range of health services at varying prices. Petitioner offered its various health plans to: (1) Individuals and their families; (2) employees of both large employers (more than 50 employees) and small employers (2 to 50 employees); and (3) individuals covered by Medicaid.

Petitioner entered into some form of written agreement with all enrollees specifying the premium charge and the medical services to which the enrollee would be entitled. Petitioner entered into master group contracts with all employers offering its health plans. Thereafter, during annual open enrollment periods, employees were permitted to enroll in the health plan and select the benefit package of his or her choice.

Although petitioner did not limit its enrollment based upon pre-existing medical conditions, certain plans excluded some pre-existing conditions from full coverage during the first 12 months of membership.

Petitioner applied an adjusted community rating methodology to determine premiums for individual and small employer group enrollees, adjusting its rates for risk factors such as age and gender.[5] Petitioner relied upon past claims experience to determine premiums for large employer group enrollees.

B. Physician Services

Petitioner did not employ a significant number of physicians.[6] Petitioner fulfilled its obligation to arrange for its enrollees to receive physician services by contracting with a

---

[5] See 42 C.F.R. sec. 417.104(b) (1995), which sets forth the requirements for acceptable community rating systems for federally qualified HMOs.

[6] Petitioner never employed more than five physicians at a time, and these physicians were hired for the limited purpose of conducting health fairs for enrollees.

panel of some 2,800 physicians including: (1) the primary care and specialist physicians employed by Health Services; and (2) 2,400 independent physicians.

The following schedule, reflecting petitioner's experience for the years 1997, 1998, and 1999, presents the total amounts (by percentage) that petitioner was billed for physician services provided by: (1) Physicians employed by Health Services' physician division (Employed); (2) independent physicians on petitioner's panel (Not Employed-Panel); and (3) all other physicians (Not Employed-Non Panel).

| Year | Employed | Not Employed-Panel | Not Employed-Non Panel |
|------|----------|--------------------|------------------------|
| 1997 | 21.6% | 66.1% | 12.3% |
| 1998 | 21.0% | 67.0% | 12.0% |
| 1999 | 20.3% | 69.4% | 10.3% |

C. Hospital Services

Petitioner did not directly own or operate any health care facilities. Petitioner fulfilled its obligation to arrange for its enrollees to receive hospital services by contracting with a panel of hospitals including Health Services hospitals and a limited number of independent hospitals. A substantial portion of petitioner's enrollees' admissions to independent hospitals were for admissions to either University of Utah Medical Center (UMC) or Davis Hospital and Medical Center. In particular, petitioner arranged for its enrollees to obtain medical services from UMC's: (1) Intermountain Burn Center (the only certified

burn center in the region); (2) Neuropsychiatric Institute (to provide psychiatric beds when LDS Hospital temporarily exceeded its inpatient capacity); and (3) Pain Management Center.  Some UMC admissions were related to a unique relationship between Primary Children's Hospital, a Health Services hospital dedicated to acute care pediatric services, and UMC's specialized genetic research and other pediatric-related teaching and research programs.  In addition, petitioner, Group, and Care entered into provider agreements with Davis Hospital and Medical Center, located in Davis County, Utah, because there were no Health Services hospitals in the immediate area.

The following schedule, reflecting petitioner's experience for the years 1997, 1998, and 1999, presents the total amounts (by percentage) that petitioner was billed for inpatient hospital services by: (1) Health Services hospitals (HS); (2) independent hospitals on petitioner's panel (Panel-Not Owned); (3) independent Utah hospitals not on petitioner's panel (Non Panel-Utah); and (4) independent hospitals outside of Utah and not on petitioner's panel (Non Panel-Non Utah).

| Year | HS | Panel-Not Owned | Non Panel-Utah | Non Panel-Non Utah |
|---|---|---|---|---|
| 1997 | 93.5% | 1.1% | 3.9% | 1.6% |
| 1998 | 91.8% | 1.7% | 4.7% | 1.8% |
| 1999 | 91.7% | 1.8% | 4.2% | 2.3% |

Approximately 60 percent of the inpatient charges for enrollees

admitted to Non Panel-Utah hospitals during 1997, 1998, and 1999 was attributable to emergency medical care.

The following schedule, reflecting petitioner's experience for the years 1997, 1998, and 1999, presents the total amounts (by percentage) that petitioner was billed for outpatient hospital visits by: (1) Health Services' hospitals (HS); (2) independent hospitals on petitioner's panel (Panel-Not Owned); (3) independent Utah hospitals not on petitioner's panel (Non Panel-Utah); and (4) independent hospitals outside of Utah and not on petitioner's panel (Non Panel-Non Utah).

| Year | HS | Panel-Not Owned | Non Panel-Utah | Non Panel-Non Utah |
|------|------|------|------|------|
| 1997 | 92.1% | 3.6% | 3.1% | 1.3% |
| 1998 | 90.4% | 4.8% | 3.7% | 1.2% |
| 1999 | 89.7% | 4.8% | 4.2% | 1.3% |

Petitioner generally compensated its contractor hospitals pursuant to a modified diagnosis related group (DRG) payment system under which an enrollee admitted to a hospital on either an inpatient or outpatient basis would be assigned a DRG and the hospital would be paid a fixed fee consistent with the DRG schedule.

D. Point-of-Service Options

Petitioner offered several plans (described below) that included a "Plus" or a point-of-service option. Enrollees in such plans were permitted to use the services of physicians and/or hospitals outside of petitioner's network with the

understanding that enrollees were:  (1) responsible for obtaining precertification for major services; (2) required to pay for the services and to seek reimbursement from petitioner; and (3) responsible for any charges exceeding petitioner's fee schedule for covered services.

### E.  Petitioner's Health Plans

Petitioner generally required its enrollees to agree to coordinate all of their medical care through a primary care physician or PCP (family practitioners, internists, pediatricians, and some obstetricians/gynecologists).  In HMO parlance, PCPs are commonly referred to as "gatekeepers" inasmuch as PCPs generally oversee a patient's medical care, particularly a patient's referrals to specialists known as specialty care physicians or SCPs.

#### 1.  SelectMed

Petitioner's SelectMed plan offered enrollees access to physician medical groups comprising more than 1,500 individual PCPs and SCPs.  As previously mentioned, enrollees were required to select a PCP for general medical care and for referral to a SCP.

Petitioner compensated PCPs in Salt Lake, Davis, and Weber Counties in Utah on a discounted fee-for-service basis settled

against a capitation budget.[7]  In particular, petitioner

consulted a variety of sources to determine an estimate of market

rate charges or fees for specific physician services.  Petitioner

then applied a discount to the estimated market rate fee to

determine the amount of the fee to be paid to the physician

medical group providing services to SelectMed enrollees.  As of

1999, petitioner applied a 25-percent discount to estimated

market rate fees for PCPs.  Petitioner then reconciled the

discounted fees for services paid to each physician medical group

on a monthly basis against the group's capitation budget.[8]  When

the total fees that petitioner paid to a physician medical group

were less than the group's capitation budget, petitioner paid the

difference to the group.  However, when the total fees that

petitioner paid to a physician medical group were greater than

the group's capitation budget, the group was required to pay the

difference to petitioner.

Petitioner compensated SCPs on a discounted fee-for-service

basis settled against a capitation budget.  As of 1999,

_____

[7]    Eighty percent of SelectMed and SelectMed Plus enrollees
resided in Salt Lake, Davis, and Weber Counties, Utah.  Although
the record is not clear on the point, we assume that PCPs from
other areas also were compensated on a discounted fee-for-service
basis.

[8]    The term "capitation" refers to the practice of paying a
physician group a fixed fee for each enrollee under the group's
care.

petitioner applied a 37-percent discount to estimated market rate fees for SCPs.

### 2. SelectMed Plus

Petitioner's SelectMed Plus plan offered enrollees access to the SelectMed panel of physicians along with a point-of-service option. SelectMed Plus enrollees choosing SelectMed physicians received higher "preferred" levels of service, whereas SelectMed Plus enrollees choosing a non-SelectMed physician received lower "standard" benefits.

Consistent with its policy under the SelectMed plan, petitioner compensated PCPs and SCPs on a discounted fee-for-service basis settled against a capitation budget.

### 3. IHC Care

Petitioner's IHC Care plan offered enrollees access to a panel of approximately 2,600 PCPs and SCPs. Like the SelectMed plan, enrollees in the IHC Care plan were required to select a PCP for their general medical care and for referral to a SCP.

Petitioner compensated IHC Care PCPs and SCPs on a discounted fee-for-service basis. During 1999, petitioner applied discounts of 26 percent and 38 percent to estimated market rate fees for PCPs and SCPs, respectively.

### 4. IHC Care Plus

Petitioner's IHC Care Plus plan offered enrollees access to the IHC Care panel of physicians along with a point-of-service

option.  IHC Care Plus enrollees choosing IHC Care physicians received higher "preferred" levels of service, whereas IHC Care enrollees choosing a non-IHC Care physician received lower "standard" benefits.

Petitioner compensated IHC Care Plus PCPs and SCPs on a discounted fee-for-service basis.  During 1999, petitioner applied discounts of 26 percent and 38 percent to estimated market rate fees for PCPs and SCPs, respectively.

### 5. IHC Direct Care

Petitioner's IHC Direct Care plan offered enrollees access to the IHC Care panel of physicians.  However, enrollees in the IHC Direct Care plan were not required to select a PCP or rely on a PCP for a referral to a SCP.

Petitioner compensated IHC Direct Care PCPs and SCPs on a discounted fee-for-service basis.  During 1999, petitioner applied discounts of 26 percent and 38 percent to estimated market rate fees for PCPs and SCPs, respectively.

### 6. IHC Direct Care Plus

Petitioner's IHC Direct Care Plus plan offered enrollees access to the IHC Care panel of physicians along with a point-of-service option.  IHC Direct Care Plus enrollees choosing IHC Direct Care physicians received higher "preferred" levels of service, whereas IHC Direct Care Plus enrollees choosing a non-IHC Direct Care physician received lower "standard" benefits.

Petitioner compensated IHC Direct Care Plus PCPs and SCPs on a discounted fee-for-service basis.  During 1999, petitioner applied discounts of 26 percent and 38 percent to estimated market rate fees for PCPs and SCPs, respectively.

7.  Health Choice

Petitioner's Health Choice plan offered enrollees access to a panel of 2,600 PCPs and SCPs along with the option to use an independent physician or facility.  Health Choice enrollees choosing Health Choice physicians or facilities received higher "preferred" levels of service, whereas Health Choice enrollees choosing non-Health Choice physicians or facilities received lower "standard" benefits.

Petitioner compensated Health Choice PCPs and SCPs on a discounted fee-for-service basis.  During 1999, petitioner applied discounts of 23 percent and 28 percent to estimated market rate fees for PCPs and SCPs, respectively.

8.  IHC Access

Petitioner entered into a so-called risk contract[9] with the Utah Department of Health (Department), effective January 1, 1995 through June 30, 1999, under which it agreed to arrange for the

---

[9]  42 C.F.R. sec. 447.361 (2000) states: "Under a risk contract, Medicaid payments to the contractor, for a defined scope of services to be furnished to a defined number of recipients, may not exceed the cost to the agency of providing those same services on a fee-for-service basis, to an actuarially equivalent nonenrolled population group."

provision of health services to Utah residents eligible for Medicaid benefits.[10]  Pursuant to the above-described contract, the Department paid monthly premiums to petitioner based upon a negotiated rate schedule under which premiums varied with the age and sex of the enrollee.

Petitioner offered Medicaid-eligible enrollees access to a large panel of PCPs and SCPs through its IHC Access plan.  IHC Access enrollees were required to select a PCP for general medical care and for referral to a SCP.  As of January 1, 1999, petitioner had nearly 36,000 Medicaid enrollees in its IHC Access plan, almost half of the population of enrollees in managed Medicaid plans in Utah.

Petitioner compensated IHC Access PCPs and SCPs on a discounted fee-for-service basis.  In addition, these physicians were eligible for certain incentive payments, including an additional payment based on the number of newborn deliveries and one-third of any budget surplus.  Petitioner applied discounts of 49 percent and 61 percent to estimated market rate fees for PCPs and SCPs, respectively.

---

[10]  42 U.S.C. sec. 1396 et seq. (1994), authorizes the use of Federal funds (in conjunction with State funds) to supplement State-administered medical assistance plans for families with dependent children, and aged, blind, and disabled individuals whose income and resources are insufficient to meet the costs of necessary medical services.

F.  Enrollment

Petitioner was the sole source of health benefits for the employees of IHC and its various affiliates.  In this regard, approximately 70,000 of petitioner's enrollees were Health Services' employees, their spouses, or dependents.

The following schedule lists petitioner's total enrollment for 1997, 1998, and 1999, by enrollee class:

| Class | Jan. 1, 1997 | Jan. 1, 1998 | Jan. 1, 1999 |
|---|---|---|---|
| Individuals | 23,809 | 37,594 | 42,220 |
| Small employers | 44,575 | 63,892 | 64,822 |
| Large employers | 220,111 | 242,898 | 273,376 |
| Medicaid | 29,723 | 33,263 | 35,902 |
| Total | 318,218 | 377,647 | 416,320 |

As of January 1, 1997, 1998, and 1999, petitioner's enrollees from large employer groups constituted 69 percent, 64 percent, and 66 percent of petitioner's total enrollees, respectively.

The following schedule lists petitioner's total enrollment for 1997, 1998, and 1999, by plan type:

| Plan | Jan. 1, 1997 | Jan. 1, 1998 | Jan. 1, 1999 |
|---|---|---|---|
| SelectMed | 94,715 | 134,555 | 165,240 |
| SelectMed Plus | 54,459 | 53,614 | 52,143 |
| IHC Care | 14,628 | 13,628 | 16,424 |
| IHC Care Plus | 102,492 | 112,539 | 116,838 |
| IHC Direct Care | 1,900 | 7,923 | 13,245 |
| IHC Direct Care Plus | 5,435 | 15,299 | 13,381 |
| Health Choice | 14,866 | 6,826 | 3,147 |
| IHC Access | 29,723 | 33,263 | 35,902 |
| Total | 318,218 | 377,647 | 416,320 |

During 1999, Utah's total population was approximately 2.1 million.  During 1999, Utah's total population of enrollees in managed Medicaid programs was 73,503.

G.  Petitioner's Total Expenditures For Medical Costs

The following schedule lists petitioner's total expenditures for medical costs by category for the years 1997, 1998, and 1999.

| Category | 1997 | 1998 | 1999 |
|---|---|---|---|
| Physicians--Primary | $ 58,264,456 | $ 72,942,723 | $ 79,496,238 |
| Physicians--Specialist | 72,675,206 | 93,067,258 | 100,719,148 |
| Hospital Services | 113,138,915 | 156,678,959 | 182,015,023 |
| Pharmacy | 41,683,824 | 57,193,724 | 63,886,920 |
| Miscellaneous | 10,028,410 | 13,565,913 | 15,817,140 |
| Total | $295,790,811 | $393,448,577 | $441,934,469 |

The foregoing amounts do not include petitioner's selling, general, and administrative costs.

H.  Health Promotion Services

Petitioner generally provided preventive health care services to its enrollees at no additional charge, including annual worksite health screenings, group health risk profiles, a 24-hour nurse hotline, ergonomics assessment and consulting, worksite health seminars, and health newsletters.  During 1999, petitioner conducted a number of free comprehensive health screenings for local schools, municipalities, and nonprofit and civic organizations.

I.  Free/Low Cost Services

Petitioner did not institute any program whereby individuals

were permitted to become members while paying reduced premiums. Aside from the free health screenings mentioned above, petitioner did not provide or arrange to provide free health care services.

Discussion

Section 501(c)(3)

To qualify as an organization described in section 501(c)(3) that is exempt from Federal income taxation pursuant to section 501(a), an organization generally must demonstrate:  (1) It is organized and operated exclusively for certain specified exempt purposes; (2) no part of its net earnings inures to the benefit of a private shareholder or individual; (3) no part of its activities constitutes intervention or participation in any political campaign on behalf of any candidate for public office; and (4) no substantial part of its activities consists of political or lobbying activities.  See Fla. Hosp. Trust Fund v. Commissioner, 103 T.C. 140, 145 (1994), affd. 71 F.3d 808 (11th Cir. 1996); Am. Campaign Acad. v. Commissioner, 92 T.C. 1053, 1062 (1989).

Qualification as an organization described in section 501(c)(3) not only provides an exemption from Federal income taxes, but also generally permits the organization to solicit and accept donations which normally are deductible by the donor against his or her Federal taxes.  See sec. 170(c); Bob Jones Univ. v. United States, 461 U.S. 574, 577-578 (1983).  With a few

minor differences, the organizations and requirements listed in section 170(c)(2) are virtually identical to those described in section 501(c)(3).  With limited exceptions not here relevant, organizations described in the other paragraphs of section 501(c) are not eligible to receive tax-deductible contributions.

In the event the Commissioner determines that an organization does not qualify for tax-exempt status, the organization may (after exhausting its administrative remedies) seek judicial review of the matter.  Section 7428(a) confers jurisdiction on the Tax Court, among other courts, to make a declaration with respect to the initial or continuing qualification of an organization as an organization described in section 501(c)(3).  See Houston Lawyer Referral Serv., Inc. v. Commissioner, 69 T.C. 570, 571 (1978).

It is well established that the scope of our inquiry is limited to the propriety of the reasons given by the Commissioner for denying an organization's application for exemption.  See Aid to Artisans, Inc. v. Commissioner, 71 T.C. 202, 208 (1978).  Thus, in making our declaration, we do not engage in a de novo review of the administrative record.  See Am. Campaign Acad. v. Commissioner, supra at 1063; Church in Boston v. Commissioner, 71 T.C. 102, 105-106 (1978); Houston Lawyer Referral Serv., Inc. v. Commissioner, supra at 573-574, 577.  The burden of proof is on the organization to overcome the grounds for denial of the

exemption set forth in the Commissioner's determination. See Rule 217(c)(4)(A); Fla. Hosp. Trust Fund v. Commissioner, supra at 146; Christian Manner Intl., Inc. v. Commissioner, 71 T.C. 661, 664-665 (1979); Hancock Acad. of Savannah, Inc. v. Commissioner, 69 T.C. 488, 492 (1977).

The parties do not dispute that petitioner was organized for an exempt purpose within the meaning of section 501(c)(3). The dispute in this case centers on whether petitioner was operated exclusively for an exempt purpose.

Section 1.501(c)(3)-1(c)(1), Income Tax Regs., provides:

(c) Operational test--(1) Primary activities. An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

The operational test focuses on the actual purposes the organization advances by means of its activities, rather than on the organization's statement of purpose or the nature of its activities. See Am. Campaign Acad. v. Commissioner, supra at 1064; Aid to Artisans, Inc. v. Commissioner, supra at 210-211. Although an organization might be engaged in only a single activity, that single activity might be directed toward multiple purposes, both exempt and nonexempt. See Redlands Surgical Servs. v. Commissioner, 113 T.C. 47, 72 (1999), affd. per curiam 242 F.3d 904 (9th Cir. 2001). "[T]he presence of a single

* * * [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes."  Better Bus. Bureau, Inc. v. United States, 326 U.S. 279, 283 (1945); see Manning Association v. Commissioner, 93 T.C. 596, 603-605 (1989); Am. Campaign Acad. v. Commissioner, supra at 1065.

Whether an organization operates for a substantial nonexempt purpose is a question of fact to be resolved on the basis of all the evidence presented in the administrative record.  See Church By Mail, Inc. v. Commissioner, 765 F.2d 1387, 1390 (9th Cir. 1985), affg. T.C. Memo. 1984-349.  For purposes of the instant proceeding, we assume that the facts as represented in the administrative record are true, although in the course of our review we may draw our own ultimate conclusions and inferences from the facts.  See Am. Campaign Acad. v. Commissioner, supra at 1063-1064; Houston Lawyer Referral Serv., Inc. v. Commissioner, supra at 573-575.

Section 501(c)(3) specifies various qualifying exempt purposes, including "charitable" purposes.  The term "charitable" is not defined in section 501(c)(3) but is used in its generally accepted legal sense.  See Nationalist Movement v. Commissioner,

102 T.C. 558 (1994), affd. per curiam 37 F.3d 216 (5th Cir. 1994); sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.

Charitable Purpose

The Supreme Court has stated that "Charitable exemptions are justified on the basis that the exempt entity confers a public benefit--a benefit which the society or the community may not itself choose or be able to provide, or which supplements and advances the work of public institutions already supported by tax revenues." Bob Jones Univ. v. United States, 461 U.S. at 591. Although neither the furnishing of medical care nor the operation of an HMO is listed as a qualifying exempt activity under section 501(c)(3), it is now well settled that the promotion of health for the benefit of the community is a charitable purpose. See Redlands Surgical Servs. v. Commissioner, supra at 73; Sound Health Association v. Commissioner, 71 T.C. 158, 177-181 (1978). As discussed in detail below, a health-care provider seeking tax-exempt status, such as an HMO, must demonstrate that it provides a community benefit.

Community Benefit Test

In Sound Health Association v. Commissioner, supra, we first considered whether an HMO may qualify as an organization described in section 501(c)(3). The Commissioner determined that Sound Health Association did not qualify for tax-exempt status pursuant to section 501(c)(3) on the ground that the organization

served the private interests of its members as opposed to the interests of the community.

In Sound Health Association v. Commissioner, supra at 182-183, we utilized the same factors deemed significant by the Commissioner in granting tax-exempt status to one of two hospitals under review in Rev. Rul. 69-545, 1969-2 C.B. 117, and referred to the factors cited favorably in that ruling as the community benefit test. In Sound Health Association, we concluded that the subject organization shared several characteristics with the hospital deemed exempt in Rev. Rul. 69-545, supra. In particular, like the hospital in the revenue ruling, Sound Health Association operated a medical clinic and employed physicians and nurses to provide medical services, and opened its emergency room to all persons requiring emergency care whether they were members or not and regardless of whether they were financially able to pay. Sound Health Association also established a research program to study health care delivery systems, conducted a health education program open to the general public, and was governed by a board of directors the majority of whom were elected by Sound Health Association members from the community at large. Sound Health Association v. Commissioner, supra at 184.

We found that Sound Health Association provided community benefits beyond those offered by the hospital deemed exempt in

Rev. Rul. 69-545, supra. Specifically, Sound Health Association adopted a plan to accept contributions for the purpose of subsidizing membership for those who could not otherwise afford to pay the full amount of monthly dues. Further, Sound Health Association's practice of offering membership to the public at large demonstrated that the class of persons eligible to benefit from the organization's activities was practically unlimited. Sound Health Association v. Commissioner, supra at 184-185.

We rejected the Commissioner's argument that Sound Health Association provided an unwarranted private benefit to its members. We reasoned that, like the hospital deemed exempt in Rev. Rul. 69-545, supra, which (except in emergency cases) limited its treatment to paying patients, Sound Health Association was permitted to restrict its services to paying members. Sound Health Association v. Commissioner, supra at 186-187.

The tax-exempt status of an HMO arose again in Geisinger Health Plan v. Commissioner, T.C. Memo. 1991-649 (Geisinger I), revd. and remanded 985 F.2d 1210 (3d Cir. 1993) (Geisinger II), opinion on remand 100 T.C. 394 (1993) (Geisinger III), affd. 30 F.3d 494 (3d Cir. 1994) (Geisinger IV). Geisinger HMO, like petitioner in the instant case, was part of a group of related organizations forming a large health care network (the Geisinger system).

Geisinger HMO arranged for its enrollees to receive hospital services by contracting for such services with other Geisinger entities (Geisinger hospitals and outpatient clinics that were recognized as exempt organizations) and independent hospitals. Geisinger HMO arranged for its enrollees to receive physician services by contracting for such services with Clinic--a tax-exempt Geisinger affiliate. Clinic provided physician services through a combination of 400 staff physicians and by contracting with independent physicians for their services. Geisinger HMO was organized as a separate entity to avoid regulatory difficulties and to simplify operations from an organizational and managerial standpoint.

Geisinger HMO offered enrollment to groups (with a minimum of 100 eligible enrollees) and individuals (and certain dependents) residing in 17 of the 27 counties in which the Geisinger system operated. Individual enrollees were required to be at least 18 years of age. Individual enrollees were required to complete a medical questionnaire, whereas group enrollees were not subject to this requirement. All enrollees generally paid the same premium based on a community rating system. During the period in question, Geisinger HMO had approximately 71,000 individual and group enrollees.

Geisinger HMO also enrolled slightly more than 1,000 Medicare recipients at a reduced rate under a "wraparound" plan

that covered medical expenses not reimbursed by Medicare.
Geisinger HMO also enrolled a small number of Medicaid
recipients.  Geisinger HMO planned to initiate a subsidized dues
program to assist enrollees who might be unable to continue to
pay their membership fees as the result of some financial
misfortune.

At the conclusion of the administrative proceedings, the
Commissioner determined that Geisinger HMO did not qualify for
exemption as an organization described in section 501(c)(3) on
the grounds that:  (1) Geisinger HMO did not satisfy the criteria
for exemption outlined in Sound Health Association v.
Commissioner, supra; and (2) Geisinger HMO was not an integral
part of its tax-exempt parent.

In Geisinger I, we held that the Commissioner erred in
determining that Geisinger HMO did not qualify for exemption
pursuant to section 501(c)(3).  We based our holding largely on a
comparison of the Geisinger HMO with the organization in Sound
Health Association v. Commissioner, supra.  In particular, we
found that, like Sound Health Association, Geisinger HMO was
operated for the charitable purpose of promoting health insofar
as its class of possible enrollees was practically unlimited, it
had adopted a subsidized dues program for its enrollees, it
offered health care services to Medicare recipients at a reduced
rate, and it was not operated for the private benefit of its

enrollees.  Geisinger Health Plan v. Commissioner, T.C. Memo.
1991-649.

In Geisinger II, the United States Court of Appeals for the
Third Circuit reversed and remanded our decision in Geisinger I.
Geisinger Health Plan v. Commissioner, 985 F.2d 1210, 1218-1219
(3d Cir. 1993).  Although the Court of Appeals agreed with the
Court that an HMO seeking tax-exempt status must provide a
community benefit, see id. at 1218-1219, the Court of Appeals
concluded that Geisinger HMO did not provide a primary benefit to
the community but, rather, provided benefits solely to its
members.  The Court of Appeals, looking at the totality of the
circumstances, stated:

> GHP standing alone does not merit tax-exempt status
> under section 501(c)(3).  GHP cannot say that it
> provides any health care services itself.  Nor does it
> ensure that people who are not GHP subscribers have
> access to health care or information about health care.
> According to the record, it neither conducts research
> nor offers educational programs, much less educational
> programs open to the public.  It benefits no one but
> its subscribers. [Id. at 1219.]

Further, the Court of Appeals attached little significance to
Geisinger HMO's subsidized dues program, stating in pertinent
part:

> The mere fact that a person need not pay to belong
> does not necessarily mean that GHP, which provides
> services only to those who do belong, serves a public
> purpose which primarily benefits the community.  The
> community benefited is, in fact, limited to those who
> belong to GHP since the requirement of subscribership
> remains a condition precedent to any service.  Absent
> any additional indicia of a charitable purpose, this

> self-imposed precondition suggests that GHP is primarily benefiting itself (and, perhaps, secondarily benefiting the community) by promoting subscribership throughout the areas it serves. [Id. at 1219.]

Although concluding that Geisinger HMO did not qualify for tax-exempt status on its own, the Court of Appeals remanded the case to the Court for a determination whether the Geisinger HMO qualified for exemption as an "integral part" of its tax-exempt parent. Id. at 1220.[11]

Integral Part Test

In Geisinger III, we held that the administrative record did not support Geisinger HMO's claim that it was entitled to tax-exempt status as an integral part of the Geisinger system. Geisinger Health Plan v. Commissioner, 100 T.C. at 404-405. As a preliminary matter, we concluded that an HMO may qualify for tax-exempt status as an integral part of a related tax-exempt entity if its activities are carried out under the supervision or control of a related tax-exempt entity and the HMO's activities would not constitute an unrelated trade or business if conducted by the related tax-exempt entity. Id. at 402, 404-405. We looked to section 513(a) which defined an unrelated trade or business in pertinent part as:

---

[11] The integral part doctrine is not codified, but its genesis may be found in sec. 1.502-1(b), Income Tax Regs., which states that a subsidiary may qualify for tax-exempt status "on the ground that its activities are an integral part of the exempt activities of the parent organization".

"any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of * * * [the] purpose or function constituting the basis for its exemption." * * * [Id. at 405.]

Because Geisinger HMO enrollees received medical services from hospitals outside of the Geisinger system, and because the administrative record lacked evidence as to whether such services were substantial, we were unable to conclude that Geisinger HMO's activities were substantially related to the activities of its tax-exempt affiliates. Id. at 405-406.

In Geisinger IV, the Court of Appeals affirmed our holding in Geisinger III, albeit on slightly different grounds. Geisinger Health Plan v. Commissioner, 30 F.3d at 501. The Court of Appeals held that an organization may qualify for tax-exempt status as an integral part of its tax-exempt parent if: (1) The organization is not carrying on a trade or business which would be an unrelated trade or business if regularly carried on by its tax-exempt parent; and (2) the organization's relationship with its tax-exempt parent somehow enhances or "boosts" its own tax-exempt character to the point that the organization would qualify for tax-exempt status. Id. at 501. Focusing solely on the latter issue, the Court of Appeals concluded that Geisinger HMO was not entitled to tax-exempt status because it did not receive the necessary boost from its relationship with exempt Geisinger

entities.  In particular, the Court of Appeals held:

> As our examination of the manner in which * * *
> [Geisinger HMO] interacts with other entities in the
> System makes clear, its association with those entities
> does nothing to increase the portion of the community
> for which * * * [Geisinger HMO] promotes health--it
> serves no more people as a part of the System than it
> would serve otherwise.  * * *  [Id. at 502.]

Under the circumstances, the Court of Appeals concluded that it
was unnecessary to consider whether Geisinger HMO's activities
would constitute an unrelated trade or business if regularly
carried on by a related tax-exempt entity.  Id. at 501.

Analysis

Consistent with the preceding discussion, petitioner's
qualification for exemption pursuant to section 501(a) as an
organization described in section 501(c)(3) initially depends
upon whether petitioner satisfies the community benefit test.  In
the event that petitioner cannot satisfy the community benefit
test, we must consider whether petitioner nevertheless qualifies
for exemption as an integral part of a related tax-exempt entity.

Even assuming that petitioner qualifies as an organization
described in section 501(c)(3), respondent contends that
petitioner is not entitled to tax-exempt status under section
501(m) which provides that an organization described sec.
501(c)(3) shall not be entitled to tax-exempt status if a

substantial part of its activities consists of providing commercial type insurance.

1.  Whether Petitioner Satisfies The Community Benefit Test

The community benefit test requires consideration of a variety of factors that indicate whether an organization is involved in the charitable activity of promoting  health on a communitywide basis.  Considering all the facts and circumstances surrounding petitioner's operations, we conclude that petitioner did not provide a meaningful community benefit, and, therefore, petitioner does not qualify for exemption pursuant to section 501(a) as an organization described in section 501(c)(3).

Much like the HMOs under consideration in Sound Health Association v. Commissioner, supra, and Geisinger Health Plan, supra, petitioner offered its health plans to a broad cross-section of the community including individuals, the employees of both large and small employers, and individuals eligible for Medicaid benefits.  Petitioner offered several different health plans encompassing a range of health services at varying prices.  There is no indication in the record that petitioner rejected any potential enrollees, although it was petitioner's practice to deny an enrollee coverage with respect to certain preexisting conditions for the first 12 months of enrollment.

During 1999, petitioner's enrollees represented approximately one-fifth of Utah's total population and petitioner's IHC Access plan enrollees constituted nearly 50 percent of Utah residents that were eligible for managed Medicaid benefits.

Despite petitioner's open enrollment policy and the wide acceptance of its plans by individuals and groups alike, petitioner's operations differed materially from the operations of Sound Health Association HMO and Geisinger HMO. Significantly, petitioner did not own or operate its own medical facilities, did not employ (to any significant extent) its own physicians, and did not offer free medical care to the needy. Additionally, petitioner did not institute any program whereby individuals were permitted to become members while paying reduced premiums, and, aside from the few free health screenings that petitioner conducted in 1999, petitioner did not provide or arrange to provide any free or low cost health care services. The record does not reflect whether petitioner applied surplus funds to improve facilities, equipment, patient care, or to enhance medical training, education, and research. See Rev. Rul. 83-157, 1983-2 C.B. 94.

Importantly, the record does not reveal why petitioner applied an adjusted community rating methodology to determine premiums for individual and small employer group enrollees while

setting premiums for large employer group enrollees based upon past claims experience. If the difference in treatment of the enrollees caused a disparity in premium costs between the classes of enrollees, there could be an inference that petitioner was benefiting larger employers. However, the record contains no explanation of the difference in treatment of enrollees.

In conjunction with the premium disparity issue, we note that, unlike the arrangement adopted by Sound Health Association, petitioner's bylaws stated that its board of trustees would be composed of a plurality of representatives from the buyer-employer community, with an approximately equal number of physicians and hospital representatives. The composition of petitioner's board of trustees, lacking in representation of the community at large, furthers the inference that petitioner predominantly served the private interests of the larger employers participating in its plans. In the absence of an explanation in the record, the Court is left with doubt as to petitioner's provision of a community benefit. Petitioner has the burden of proof. See Rule 217(c)(2)(A); Geisinger Health Plan v. Commissioner, 100 T.C. at 406.

In sum, we hold that petitioner has not established that it provided a community benefit that qualifies it for tax-exempt status pursuant to section 501(c)(3). Put another way, it has failed to show that it provides any community benefit that

accomplishes a charitable purpose.  We next consider whether petitioner qualifies for tax-exempt status as an integral part of a related tax-exempt entity.

2.  Whether Petitioner Satisfies The Integral Part Test

In Geisinger III, we concluded that an organization may qualify for exemption as an integral part of a tax-exempt affiliate if:  (1) The organization's activities are carried out under the supervision or control of a tax-exempt affiliate, and (2) such activities would not constitute an unrelated trade or business if conducted by a related tax-exempt entity.  Geisinger Health Plans v. Commissioner, 100 T.C. at 402-405.  There is no dispute that petitioner's activities were carried out under the supervision and control of IHC--a tax-exempt affiliate.  Thus, we need only consider whether petitioner's activities would constitute an unrelated trade or business if conducted by a related tax-exempt entity.

In Geisinger III, we held that, because Geisinger HMO enrollees received some hospital services from independent hospitals, Geisinger HMO had to show that its overall operations were substantially related to the functions of its tax-exempt affiliates.  Id. at 405.  We stated:

> If petitioner's activities are "conducted on a scale
> larger than is 'reasonably necessary'" to accomplish
> the purposes of the exempt entities, there is no
> substantial relationship within the meaning of the
> regulations.  Hi-Plains Hospital v. United States, 670
> F.2d at 530-531; sec. 1.513-1(d)(3), Income Tax Regs.
> [Id. at 406.]

Although Geisinger HMO enrollees received all of their physician services through Clinic, an exempt affiliate, Geisinger HMO enrollees received approximately 20 percent of their hospital services from independent hospitals. Because the record did not disclose why Geisinger HMO enrollees received hospital services from hospitals outside of the Geisinger system, we were unable to conclude that Geisinger HMO's operations were substantially related to the functions of its tax-exempt affiliates. Id. at 404-406.

Like Geisinger HMO, petitioner neither owned nor operated any medical facilities and did not employ a significant number of physicians or health care professionals. Petitioner fulfilled its obligation to provide medical services to its enrollees by contracting with physicians (both physicians employed by Health Services and independent physicians) and hospitals (both Health Services hospitals and independent hospitals) to provide such services. In contrast to Geisinger III, however, the administrative record in this case indicates that the medical services that petitioner's enrollees received from independent hospitals were largely attributable to admissions to either UMC or Davis Hospital and Medical Center. Further, these admissions were undertaken to: (1) Take advantage of specialized services (such as burn treatment and pain management) provided at UMC; (2) address occasional shortages of psychiatric beds in Health

Services hospitals; and (3) accommodate petitioner's enrollees living in Davis County, Utah, where Health Services lacked a hospital.  Because the circumstances under which petitioner's enrollees received hospital services from independent hospitals were limited to situations where Health Services was unable to provide specialized hospital services or were due to geographical expediency, or both, we are satisfied that petitioner's method for arranging for its enrollees to receive hospital services was substantially related to Health Services' tax-exempt function.

However, we do not end our analysis here.  In particular, the administrative record reveals that petitioner's enrollees received a substantial portion of their physician services from independent physicians.

In Geisinger III, we did not discuss the provision of physician services to Geisinger enrollees inasmuch as Geisinger HMO arranged for its enrollees to receive all their physician services from Clinic--a tax-exempt affiliate of Geisinger HMO. Clinic in turn arranged to provide physician services to Geisinger enrollees through its approximately 400 physician/employees (approximately 84 percent of services) and through contracts with independent physicians (approximately 16 percent of services).  In contrast, in the instant case, petitioner's enrollees received approximately 20 percent of their physician services from physicians employed by or contracting

with Health Services, while petitioner contracted for the remaining 80 percent of such physician services directly with independent physicians.  In other words, petitioner's enrollees received nearly 80 percent of their physician services from physicians with no direct link to one of petitioner's tax-exempt affiliates.

Petitioner contends that its contracts with independent physicians are not relevant to the question of whether it qualifies for tax-exempt status as an integral part of its tax-exempt IHC affiliates because all such independent physicians were required to maintain privileges at Health Services' hospitals.  We disagree with the basic premise underlying petitioner's argument.

Health Services comprised the hospital division, which operated a large number of hospitals and clinics, and the physician division, which employed approximately 400 primary care and specialist physicians who generally practiced in Health Services' clinics and other community-based settings. Considering that petitioner does not provide free or low cost health services, we fail to see how petitioner's operations, including its heavy reliance on independent physicians, would be essential to or substantially related to Health Services' exempt functions.  To the contrary, petitioner's method of arranging for its enrollees to receive physician services suggests that

petitioner conducted its operations on a scale "larger than is reasonably necessary to accomplish the purposes of the exempt entities". <u>Geisinger Health Plans v. Commissioner</u>, 100 T.C. at 406.  Based on the record presented, we hold that petitioner does not satisfy the integral part test.[12]

In sum, petitioner did not provide the community benefit required for petitioner to qualify as an organization described in section 501(c)(3).  Further, petitioner's operations were not essential to or substantially related to Health Services' exempt functions.  Consequently, petitioner is not entitled to the declaratory judgment it seeks.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[12]    Under the circumstances, we need not consider whether we would apply the "boost" test set forth in <u>Geisinger Health Plan v. Commissioner</u>, 30 F.3d 494, 501 (3d Cir. 1994).  In addition, we need not consider respondent's alternative contention that petitioner is not entitled to tax-exempt status pursuant to sec. 501(m).